488 A.2d 581

**BETHLEHEM STEEL CORPORATION, Appellant,**

**v.**

**LITTON INDUSTRIES, INC., a corporation, and Erie Marine, Inc., a division of Litton Industries, trading as Erie Marine Division of Litton Industries, Appellees.**

Supreme Court of Pennsylvania.

Argued Sept. 13, 1984.

Decided Feb. 22, 1985.

Reargument Denied May 28, 1985.

William B. Mallin, Willis A. Siegfried, Jr., Robert L. Byer, Eckert, Seamans, Cherin & Mellott, Pittsburgh, for appellant.

Bruce W. Kauffman, Carl H. Hanzelik, Jonathan D. Natelson, Paul S. Diamond, Dilworth, Paxson, Kalish & Kauffman, Philadelphia, Harold Gondelman, Gondelman, Baxter, McVerry, Smith, Yatch & Trimm, Pittsburgh, for appellees.

Before LARSEN, FLAHERTY, HUTCHINSON and ZAPPALA, JJ.

## ORDER OF COURT

PER CURIAM.

The Court being evenly divided, the Order of the Superior Court, 321 Pa.Super. 357, 468 A.2d 748, is affirmed.

FLAHERTY, J., files an Opinion in Support of Affirmance in which HUTCHINSON, J., joins.

HUTCHINSON, J., files an Opinion in Support of Affirmance.

ZAPPALA, J., files an Opinion in Support of Reversal in which LARSEN, J., joins.

NIX, C.J., McDERMOTT and PAPADAKOS, JJ., did not participate in the consideration or decision of this case.

## OPINION IN SUPPORT OF AFFIRMANCE

FLAHERTY, Justice.

On April 25, 1968 Litton Industries, Inc., its wholly owned subsidiary, Erie Marine,[1] Inc. and Bethlehem Steel Corporation met to formally exchange an already agreed upon contract for the construction of a multi-million dollar ore vessel. This boat, the *Cort*, was unique in size and design: it was one thousand feet long and was self-unloading. No similar boat had ever before been built and negotiations for the contract had taken some four months. At this same meeting where the contractual formalities for the *Cort* were exchanged, Litton initiated a proposal that the parties

---

**1.** Erie Marine was a party to the action below. Hereinafter, Erie and Litton are jointly referred to as "Litton."

enter into a further agreement which would give Bethlehem a five year option to purchase an additional five vessels identical to the one just contracted for, and the parties jointly prepared the following letter on that subject:

## ERIE MARINE, INC.

## ERIE, PENNSYLVANIA

April 25, 1968
Bethlehem Steel Corporation
Bethlehem, Pennsylvania
Attn: Ralph K. Smith
Gentlemen:

Reference is made to the ship construction contract signed by our companies this date for the construction by us of a 1,000' self-unloading ore vessel for you. Reference is also made to my letter to you of this date extending to you an option to purchase either one or two additional vessels upon the terms therein set forth.

We hereby extend to you an offer to enter into an option agreement to have us construct for you from one to five additional vessels in accordance with "Specifications covering the Construction of a Self-Unloading Bulk Carrier for Bethlehem Steel Corporation" (Number Y 917) dated March 1968, addendum number 1 thereto dated March 28, 1968 and addendum number 2 thereto dated April 17, 1968. This offer to enter into an option agreement shall be firm and irrevocable until December 31, 1968 at 5:00 P.M. E.S.T.

The terms of the option agreement are to be as follows:

(a) The specifications for the vessels shall be the specifications referred to above, except for mutually agreeable reduced test schedules of the vessels, if the testing of the vessel to be delivered under the contract executed this date proves successful.

(b) Bethlehem to have the right at any time within five years after the effective date of the option agreement to order from one to not more than a total of five vessels,

for delivery within 24 months from the date of the order for the first vessel ordered and for delivery within 24 months plus 4 months for each additional vessel ordered within any one calendar year; provided however no vessel shall be scheduled for delivery between November 31 and March 31.

(c) The price of the vessels shall be as follows:

| 1st vessel ordered | $22,400,000.00 |
|---|---|
| 2nd " " | $21,400,000.00 |
| 3rd " " | $20,400,000.00 |
| 4th " " | $19,400,000.00 |
| 5th " " | $18,400,000.00 |

(d) The vessel prices are subject to escalation for both labor and material for a base price of $20,400,000.00 for each vessel and based upon Fourth Quarter 1968 mutually agreed upon index such as:

Material—"Material index for Bureau of Ships steel vessel contracts" furnished to the Naval Ship Systems Command by the Bureau of Labor Statistics of the U.S. Department of Labor.

Labor—"Index of changes in straight-time average hourly earnings for selected shipyards" (June 1962 = 100) for steel ship construction, furnished to the Naval Ship Systems Command by the Bureau of Labor Statistics of the U.S. Department of Labor.

At the time of exercise of the option for any vessel, the escalation shall be computed to the date of contract execution, and an appropriate contract clause will be included therein providing for quarterly escalation thereafter. We will furnish you the labor and material percentages subject to escalation by May 15, 1968.

(e) The terms and conditions of the ship construction contracts to be in accordance with the attached terms and conditions and any other mutually agreed to terms and conditions and shall contain a clause giving to Bethlehem the right to cancel at any time upon the payment of all of our costs incurred to date of cancellation, including similar vendor and subcontractor cancellation charges, plus 15% of such costs.

Very truly yours,

George K. Geiger

The construction contract referred to in paragraph one consists of approximately 500 pages of specifications for the construction of the *Cort*, which was built on a fixed price basis. In response to this letter, Bethlehem, on December 31, 1968, wrote: "We hereby accept your offer of an option to have you construct for us from one to five additional vessels...." In all other pertinent respects, the Bethlehem letter repeated the substance of the letter from Geiger, except that Bethlehem's letter was countersigned at its conclusion as follows:

AGREED TO:

ERIE MARINE, INC.

by George K. Geiger, President

Although the parties never reached agreement as to any of the open terms contained in this writing, in 1973, Bethlehem formally notified Litton that it was exercising its option to purchase three more ore ships of the type specified in the December 31, 1968 letter. Litton refused to perform under the terms of the 1968 letter, and Bethlehem brought an action against Litton claiming that it had repudiated its obligations under the 1968 letter, which Bethlehem characterized as an "option agreement," and that its actions constituted an anticipatory breach of this agreement. Bethlehem's damages for the alleged breach were stated at $95 million. Litton filed counterclaims in assumpsit for lost profits which it allegedly would have made on the building of the three vessels, had Bethlehem negotiated in good faith, and in trespass, for consequential and punitive damages for Bethlehem's alleged failure to negotiate in good faith.

A trial was then conducted in the Allegheny County Court of Common Pleas before Judge Maurice Louik. The proceedings lasted some nine months and produced more than 12,000 pages of testimony and 500 exhibits. It can

hardly escape notice that the proceedings were somewhat protracted. As counsel for Litton noted during final argument, "May it please the court. Now ... we enter into the fourth season in this case—we started in summer, went through the fall and winter and it's now spring, although the snowflakes are still falling...." In spite of the complexity of the case and the length of the litigation, or perhaps because of it, the parties were able to agree that the trial should be bifurcated on the issues of liability and damages. The trial court, without reaching the issue of damages, decided the liability issue against Bethlehem. On appeal, a divided Superior Court affirmed, Judges Hester, Rowley and Wieand dissenting. 321 Pa.Super. 357, 468 A.2d 748. We granted allocatur.

Judge Louik held that Bethlehem's action must fail because there was no enforceable agreement between the parties since the price term was so indefinite as to render the court unable to fill the gap. The Superior Court majority stated that the trial court "held that the plaintiff-appellant had not sustained its burden of proving that the parties intended to be contractually bound." 321 Pa.Superior Ct. at 359, 468 A.2d at 748. The Superior Court majority also observed that the intent to contract is a question of fact which must be affirmed on review if the lower court's finding that there was no intent to contract was supported by competent evidence. After reviewing the evidence, Superior Court held that the trial court's finding as to the intent of the parties must be affirmed because it was supported by competent evidence and because the lower court had not abused its discretion. Superior Court also noted the lower court's determination that the parties had not included the terms necessary to calculate the escalation in price referred to in the contract. These open terms, according to Superior Court, supported an inference that the parties did not intend to be legally bound.[2]

2.  There seems to be a dispute as to whether the trial court held that the parties did not intend to be contractually bound, or merely that the terms of the purported agreement were so indefinite that the court could not fill the gap. The trial judge himself disclaimed what was to

The dissent, however, observed that under the Uniform Commercial Code, a contract may be made in any manner which indicates agreement, including conduct, and that when a contract exists, it will not fail if there is a "reasonably certain basis" for fashioning a remedy. 13 Pa.C.S.A. § 2204. The dissent then determined that the conduct of the parties indicated an intent to enter a legally binding contract and that under 13 Pa.C.S.A. § 2305, the section of the code concerning contracts containing an "open price term," a "reasonable price at the time of delivery" is the proper remedy and that the court is capable of fashioning such a remedy.

## STANDARD OF REVIEW

It is axiomatic, of course, that this Court will not disturb the factual findings of a trial court if there is competent evidence of record to support the findings and if the court has not abused its discretion. Further, when intent to contract is at issue, the lower court's determinations of intent will not be disturbed if supported by competent evidence and if the court did not abuse its discretion. *Snow v. Corsica Construction Co.*, 459 Pa. 528, 329 A.2d 887 (1974); *Field v. Golden Triangle Broadcasting, Inc.*, 451 Pa. 410, 305 A.2d 689 (1973); *Hatalowich v. Redevelopment Authority of Monessen*, 454 Pa. 481, 312 A.2d 22 (1973); *Goldman v. McShain*, 432 Pa. 61, 247 A.2d 455 (1968).

become the view of the Majority of the Superior Court when, at post-trial motions, the following exchange took place.

MR. KAUFFMAN [attorney for Litton]: There are two independent grounds. The opinion went off on two separate and independent grounds. One, there is no contract.

Two, even if there were a contract, the gaps are so complex and so wide that the Court can't fill them in and therefore there is no enforceable agreement.

HON LOUIK [The trial judge]: I didn't say that. I said there was no evidence in the record for which the Court could fill in the gaps. Repr.Rec. at 6958a. Judge Louik's remark notwithstanding, Superior Court's interpretation of the adjudication is plausible. Although the trial court made no factual finding that the parties intended not to contract, a fair inference may be drawn from the court's "Discussion" section of the adjudication that no contractual intent existed. We adopt that inference.

Although the dissent in Superior Court characterized the determination of contractual intent as one of ultimate fact, or one of inference drawn from facts, and therefore reversible by an appellate court, it is nevertheless true that Pennsylvania law has traditionally treated such determinations as factual:

> The first issue involves the Chancellor's [finding that the parties entered into a particular oral agreement]. We are mindful that the findings of the Chancellor will not be reversed unless it appears that he has clearly abused his discretion or committed an error of law ... and that the findings have the full force of a jury verdict and, if supported by sufficient evidence and if affirmed by the court en banc, will not be disturbed on appeal.... As we stated in *Masciantonio Will* ... "The test is not whether we, the appellate court, would have reached the same result had we been acting as the hearing judge who saw and heard the witness, 'but rather whether a judicial mind, on due consideration of the evidence, as a whole, could reasonably have reached the conclusion of the chancellor.'"

*Yuhas v. Schmidt*, 434 Pa. 453–54, 258 A.2d 616, 619–20 (1969). While the dissent's point is well taken that a finding of contractual intent is an inference drawn from facts, it is also an inference drawn in the context of the whole record, including matters of credibility, and such matters are clearly for the trial court to determine. Thus, our standard of review is to ask whether the findings of fact, including the determination of contractual intent, are supported by any competent evidence of record which a reasonable judicial mind could find as supportive of the determination made by the fact finder.[3]

Within the context of this standard of review, the two issues which this Court must address in the present case are whether the parties intended to enter into a legally

---

3. *Compare* II Anderson *On the Uniform Commercial Code* (3d Ed.) § 2–204:66: "Where there has been a finding that the parties in fact reached an agreement although all terms were not specified, such finding will not be reversed on appeal where supported by evidence."

enforceable option contract for the sale of ore vessels; and whether, if the parties intended that such a contract exist, its terms are sufficiently clear to be enforceable. Among the evidence of record which has a bearing on these issues are: (1) the writings themselves; (2) statutory provisions concerning the formation of contracts with open terms; (2)(a) conduct having a bearing on the determination of contractual intent; (2)(b) open terms which may have a bearing both on intent and ability of the court to fashion a remedy.

### (1) THE WRITINGS

### THE LETTERS OF APRIL 25, 1968 and DECEMBER 31, 1968

It is possible, of course, that a clear indication of contractual intent might be gleaned from the documents themselves, and to that end, they must be considered. Litton's letter of April 25, 1968 reads: "We hereby extend you an offer to enter into an option agreement.... This offer to enter into an option agreement shall be firm and irrevocable until December 31, 1968 at 5:00 P.M. E.S.T." Bethlehem on December 31, 1968 responded: "We hereby accept your offer of an option...."

As the trial court indicated, if Bethlehem had accepted what was offered, it would have accepted "your offer to enter into an option agreement," not "your offer of an option." By purporting to accept an option, Bethlehem, was, as the trial court put it, accepting more than was offered. Thus, it cannot be said from an examination of the documents alone that the parties intended to be contractually bound to the terms of the writings, for one was offering we know not what and the other was accepting something that was not offered.

Moreover, the writings contain a number of open terms: (a) an excalation index (a multiplier which adjusts the price of labor and materials for inflation), (b) "an appropriate contract clause" providing for quarterly escalation after the option is exercised (hereinafter referred to as an "apportion-

ment clause" because it determines the manner in which escalation will be paid or apportioned over each quarter of the contract period); (c) "any other mutually agreed to terms and conditions."

Nevertheless, regardless of the ambiguity of the writings, because the parties' conduct, under the provisions of the Uniform Commercial Code, may indicate that the parties did in fact intend to be contractually bound and, and because under the Code the missing terms may be able to be supplied by a court, we must examine the principles of the law under the Code which govern the formation of sales contracts.[4]

### (2) FORMATION OF A CONTRACT WITH OPEN TERMS

The section of the Uniform Commercial Code, as enacted in Pennsylvania, concerning formation of contracts provides:

### § 2204  Formation in General

(a) **General rule**—A contract for sale of goods may be made in any manner sufficient to show agreement, including *conduct by both parties which recognizes the existence of such a contract.*

*    *    *    *    *    *

---

**4.** Although Litton argues that the Uniform Commercial Code is not applicable to this case, we disagree. By its terms, Division 2 of the Code as enacted in Pennsylvania "applies to transactions in goods...." 13 Pa.C.S.A. § 2102. "Goods" is defined as "all things (*including specially manufactured goods* ) which are movable at the time of identification to the contract for sale...." 13 Pa.C.S.A. § 2105. Litton argues that there is nothing of record to indicate whether the boat under construction would have been "moveable" at the time it was "identified to the contract." We reject this notion. Although a sample contract was exchanged with the letter of April 25 which contains articles which deal with a payment schedule and the vesting of title—events related to identification—, since these matters were never finally agreed to, 13 Pa.C.S.A. § 2501(a)(2) governs the matter, and provides that when there is no contrary agreement of the parties, in a sale for future goods identification occurs when the goods are shipped or marked as goods to which the contract refers. At the time of shipping, the boat, by definition, would be moveable.

**(c) Effect of open terms**—Even though one or more terms are left open a contract for sale does not fail for indefiniteness *if the parties have intended to make a contract and* there is a *reasonably certain basis* for giving an appropriate remedy.

13 Pa.C.S.A. § 2204. (Emphasis supplied). The Comment to subsection (c) states:

Subsection [(c)] states the principle as to "open terms" underlying later sections of the Article. If the parties intend to enter into a binding agreement, this sub-section recognizes that agreement as valid in law, despite missing terms, if there is any reasonably certain basis for granting a remedy. The test is not certainly as to what the parties were to do nor as to the exact amount of damages due the plaintiff. Nor is the fact that one or more terms are left to be agreed upon enough of itself to defeat an otherwise adequate agreement. Rather, commercial standards on the point of "indefiniteness" are intended to be applied, this Act making provision elsewhere for missing terms needed for performance, open price, remedies and the like.

The more terms the parties leave open, the less likely it is that they have intended to conclude a binding agreement, but their actions may be frequently conclusive on the matter despite the omissions.

For purposes of this case, the significance of § 2204 and its comment is that, generally, it tells us a contract may be formed "in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract," and that even if some terms of the contract are left open, the contract will not fail for indefiniteness if there is a *contractual intent and* a *"reasonably certain"* basis to give a remedy. Further, the comment tells us that the general purpose of this section is to give effect to agreements which the parties intended to be effective, even if there are missing terms, but only if there is—again—a "reasonably certain" basis for fashioning a remedy. The comment goes on to observe that the more

terms there are which are left open, the less likely it is that the parties intended a contract, but the comment leaves open the possibility that the parties' actions might so blatantly acknowledge the intent to be contractually bound that an inference of contractual intent may be drawn in spite of the number of terms left open.

Applying these principles to the present case, we must determine whether the parties intended to create a contract *and* whether there is a "reasonably certain basis" for supplying a remedy if they did so intend. In making the determination as to intent, we may consider the conduct of the parties and the number and nature of terms left open.

(2)(a). INFERENCES AS TO CONTRACTUAL INTENT WHICH MAY BE DRAWN FROM THE CONDUCT OF THE PARTIES

The dissenting opinion of Judge Hester in Superior Court notes a number of matters which, in the dissent's view, constitute conduct indicating an intent to be contractually bound. Two of these items are worthy of comment:

9. In its financial plan of July, 1973, Litton acknowledged the outstanding option as follows:

"It should be noted that Bethlehem has an option for construction of up to five (5) new vessels. That option will not expire until December 31, 1973. The terms of the option, if exercised by Bethlehem, would result in substantial losses by Litton."

14. In a letter of March, 1970, from Litton to Bethlehem, Litton stated as follows:

"Bethlehem already has an option agreement covering the next five vessels of the L.S.C. [Litton Super Carrier] type. We assume that you continually weigh the escalating cost of exercising these options against the projected going rate, your own fleet cost, the cost and benefits of postponing the decision further, and other investment opportunities in Bethlehem."

Slip Op. at 40, 41. Item #9 overtly acknowledges that "Bethlehem has an option," and item #14 similarly states, "Bethlehem already has an option agreement covering the

next five vessels. . . ." Such language clearly indicates that at least some Litton people believed there was an option contract, and if there were nothing more, would constitute conduct of a party indicative of an intent to be contractually bound.

On the other hand, other items listed by the dissent in Superior Court as indicative of contractual intent, are not so indicative:

7. In its internal Financial Forecast of February, 1973, Litton calculated certain escalated contract prices, for the estimated cost of ore vessels and concluded "the contract value, based upon the Bethlehem letter of December, 1968 does not support persuing [sic] this business."

12. In 1971, Litton attempted to sell its shipyard on the Great Lakes to American Shipbuilding; and, in a draft acquisition agreement, Litton listed its obligations "in and pursuant to that certain agreement between Erie Marine Inc., and Bethlehem Steel Corporation set forth in letters dated April 25, 1968, May 8, 1968, November 29, 1968, and December 31, 1968."

Slip Op. at 39, 40. As to item # 7, the fact that Litton calculated "certain escalated contract prices" for the ore vessels does not mean that Litton believed it had a contractual obligation. In fact, the last sentence of # 7 indicates the opposite: it states that the contract value does not support pursuing the business, implying the existence of a choice—not an obligation—as to whether the business should be pursued. Concerning item # 12, the fact that Litton told a potential buyer of its Erie shipyard that there was a "certain agreement" between Litton and Bethlehem which was contained in various letters was merely a recognition that this potential purchaser had a right under the draft acquisition agreement to know of potential liabilities. Litton may or may not have thought there was a contractual obligation between the parties, but it had a contractual obligation to inform American Shipbuilding of the possibility that if it purchased the Erie yard, it might be buying a lawsuit.

In all, the dissent below lists a total of sixteen items which allegedly illustrate conduct of the parties indicative of an intent to be contractually bound. Some of these items, in fact, support that inference; others do not. The importance of this observation is only that if there is a case to be made supporting the inference of Litton's intent to be contractually bound derived from Litton's conduct, the case is not so strong as the dissent would have it.

Concerning Bethlehem's conduct, it is self-evident that the letter of August 21, 1973 from A.K. Smith, Bethlehem's Purchasing Agent, indicating that Bethlehem intended to exercise its "options," constituted conduct consistent with an intent to be contractually bound. Further, it cannot be said that Bethlehem's failure to bargain earlier as to the open terms of the option necessarily is conduct which is inconsistent with an intent to be contractually bound. However, even in the August 21, 1973 letter, Bethlehem's Purchasing Agent stated:

> Several aspects of the referenced agreement are subject to the mutual agreement of the parties and we request an early meeting with you to resolve these matters. Please let us have your early reply.

Thus, the very letter in which Bethlehem announces its intent to exercise its purported option specifically acknowledges that the agreement has open terms which must be mutually agreed to as a condition precedent to the effectiveness of the agreement. Additionally, Bethlehem's Purchasing Agent admitted at trial: "We indicated on August 21, we intended to exercise our options and there were things that had to be resolved before we actually could have a commitment." This same witness also testified, as follows:

> Q. Why didn't you make the downpayment at the time you sent the letter [purporting to exercise Bethlehem's option]?
>
> A. Because, we didn't have an agreement with you. There were clauses that we agreed—there were clauses that we agreed would have to be mutually agreed to.

\* \* \* \* \* \*

Q. Is it your testimony that the only reason you didn't make a downpayment was because no invoice was submitted?

A. No. There wasn't a contract signed at that point in time. Why should we pay the ten percent?

Repr.Rec. 2736a, 2739a–40a. It would be fair to say that such conduct, as explained by this witness, a key Bethlehem employee, was inconsistent with a belief that the parties were contractually bound. Rather, it was consistent with a desire to *become* contractually bound.

The record literally bulges with letters, conversations and explanations on the part of both parties—all of which might generally be classified as "conduct" and explanations of conduct—which indicate both that the parties did and also that they did not intend to be contractually bound. When there is important conduct and explanatory testimony on the part of the parties that both supports and negates the inference of intent to be contractually bound, as there is in this case, an inference of contractual intent may not be drawn, and plaintiff has not met its burden of proof by a preponderance of evidence.

Thus, there was competent evidence of record indicating that the conduct of the parties was inconsistent with an intent to be contractually bound, and the trial court's adjudication could be supported on this alone, for 13 Pa.C.S.A. § 2204 requires that in order for a contract to be formed, there must be *both* contractual intent *and* a reasonably certain basis for awarding a remedy. When one of these necessary elements is missing, there is no contractual intent and any purported agreement is not enforceable as a contract.[5]

**5.** The dissent in Superior Court relies in part on another section of the code, 2–305, 13 Pa.C.S.A. § 2305:

**§ 2305. Open price term**
**(a) General rule.**—The parties if they so intend can conclude a contract for sale even though the price is not settled. In such a case the price is a reasonable price at the time for delivery if:
(1) nothing is said as to price;

## (2)(b).  INFERENCES OF CONTRACTUAL INTENT WHICH MAY BE DRAWN FROM THE OPEN TERMS

It will be recalled that under the provisions of § 2204, the existence of open terms in a writing will not necessarily defeat the enforceability of a contract so long as there is a contractual intent.  However, the number of open terms may have a bearing on a determination of contractual intent, and whether there is a reasonably certain basis for fashioning a remedy will determine whether the contract will fail for indefiniteness.

Although we have already seen that there is an adequate basis in the record for determining that the parties did not intend to contract, if we assume *arguendo* that they did, we must then look at the open terms in the parties' writings, which are:

(1) the indexes to be used for the escalation of labor and material;

(2) the apportionment of this escalation on a quarterly basis;

(3) other terms mutually agreed to terms and conditions

As to (1), the indexes which provide for escalation of labor and material costs in line with inflation, the evidence of record established, and the trial court found, that there are no standard escalation indexes.  The record indicates that during the years relevant to this case, there were thousands of published independent indexes which could be used to formulate escalation clauses, Repr.Rec. 5810a;  that even if one considered only a single index, for example the NAVships material index for iron and steel, approximately 125 individual indexes are aggregated to form the compos-

(2) the price is left to be agreed by the parties and they fail to agree; or

(3) the price is to be fixed in terms of some agreed market or other standard as set or recorded by a third person or agency and it is not so set or recorded.

As the discussion in (2) and (2)(a) above indicates, a necessary condition of contract formation is contractual intent.  That is also required by § 2305(a).  Since no contractual intent may be inferred, the contract fails both under § 2304 and § 2305.

ite index for iron and steel; and that in the same NAVships index, 140 separate commodity indexes comprise the general purpose machinery and equipment index. Repr.Rec. 5847a–5851a. The importance of this information is that since there is no "standard" index to use, and since an individual index may be constructed by using one or many individual indexes (weighted, for example, for the commodities used in the project being contracted for, and even for the geographical location of the project), there is no "reasonably certain" way to know which of the thousands of possibilities for constructing an index the parties would have agreed upon.

Item (2) concerns the apportionment schedule. Once an escalation index is agreed upon and that is applied to the base price (here $20,400,000.00), then the parties must agree upon the amount to be escalated during each quarter of the contract. The reason for this is that if an apportionment schedule is constructed which requires the buyer to pay a larger percentage of the apportionment at the end of the contract period, when prices and costs have gone up because of inflation, the buyer will pay significantly more escalation dollars than if he had paid early in the contract period. Thus, it is in the shipbuilder's interest to delay the apportionment schedule until the end of the contract period, but it is in the buyer's interest to pay as much of the apportionment as possible in the early quarters. In one hypothetical calculation of delivered price based on 93% of the escalation amount being paid in the last quarter, the shipbuilder's price, *using this variable alone to calculate the delivered price of one ship*, was $5,493,000 more than the buyer's calculated price as indicated in one of the buyer's exhibits. Repr.Rec. 6037a. Since the writing in question concerned five ships, by varying the apportionment term in the shipbuilder's favor, the contract price for five ships would increase more than $25,000,000.

Thus, the record not only supports the trial court's finding that there is no standard or "typical" apportionment of escalatable costs, but it demonstrates as well that the

apportionment schedule alone, forgetting all of the other variables represented by the open terms, may make a difference of millions of dollars on the delivered price of even a single boat.

Item (3), concerns other mutually agreed to terms which may be added by the parties. The trial court found and the record supports the finding that in September of 1973 Bethlehem submitted to Litton a draft construction contract which contained 12 additional terms beyond those contained in the sample contract which was referred to in Bethlehem's letter of December 31, 1968. These additional terms included various warranties, a provision for liquidated damages, a revision of the payment schedule, retainage of an amount of the contract price after delivery, a buy-American clause, a drydocking-repair provision, and a clause that would prevent Erie from merging or consolidating with any other corporation without Bethlehem's consent. It is self-evident that some if not all of these matters are significant and might well be the subject of disagreement between the parties. Taking only one item as an illustration, a Bethlehem official was questioned as follows about the buy-American clause:

Q. And the buy-American provision was inserted in the Defendants' Exhibit 12 [a draft ship construction contract submitted by Bethlehem to Litton at a meeting of September 24, 1973] in Paragraph 16.4. Is that correct?

A. Yes, sir.

Q. There was no buy-American provision in Plaintiff's Exhibit 2 [sample ship construction contract exchanged between the parties when Litton's April 25, 1968 letter was delivered] was there?

A. No, sir.

Q. And the buy-American provision was a matter of serious concern to you? Wasn't it?

A. Yes, sir.

Q. And that was something that you told Litton and Erie? Wasn't it?

\* \* \* \* \* \*

A. Yes, sir, yes, it was.

Q. And you told them that in accordance with the policy of Bethlehem Steel Corporation that you, as a representative of Bethlehem Steel Corporation, wanted a buy-American provision in the contract or any contract for additional vessels? Isn't that correct?

A. That we would want such a clause included, a buy-American clause included in the contract, yes, sir.

Q. And there were other clauses such as liquidated damages and guarantees and others, and I'm not going to compare D–12 with P–2, ... But there were other clauses that were included in D–12—that were placed in D–12 that were not in Plaintiff's Exhibit 2? Isn't that right?

A. That's right.

Q. Now, on or prior to December 31, 1973, did anyone from Bethlehem tell anyone from Litton and Erie that with respect to acquiring additional vessels from Erie, that Bethlehem was agreeable to signing a contract with the terms contained in P–2 sample form of contract without any additional terms?

A. I don't recall any such statement that included "without any additional terms..."

Repr.Rec. 3070a–3072a. Without going into a protracted discussion of each of Bethlehem's proposed additional terms, it suffices, for purposes of determining contractual intent, to note that there were twelve such terms, that at least one of them was described by a Bethlehem official as a matter of "serious" concern, and that Bethlehem apparently made no offer to enter into an agreement without such additional terms. Under these conditions, the parties can hardly be said to have agreed on what additional terms, if any, would be included in a contract.

Moreover, and this is the final point, all of these open terms are interrelated. It may have been that if Bethlehem would agree to omit some or all of its additional terms, Litton would agree to an escalation index proposed by Bethlehem, or that Litton would agree to the index if an additional concession were made by Bethlehem that the

quarterly apportionment of escalation amounts would be weighted toward the end of the contract period. The point is that far from leaving open terms which could be easily filled by a court, the parties left open what amounted to gaping holes in a multi-million dollar contract that no one but the parties themselves could fill. There is no "reasonably certain" basis upon which any court could fill the gaps, and thus the trial court's findings as to the open terms are supported by competent evidence of record.

In sum, a review of the record indicates that there is more than ample evidence to support the trial court's findings that there was no contractual intent and that the open terms could not be filled by the court. The writings themselves are ambiguous as to what the parties intended. Moreover, the conduct of the parties offers no more certain guidance than the writings as to intent, and the nature of the open terms argues against contractual intent. But even if contractual intent were assumed, the contract would fall for indefiniteness because the open terms may not be filled by the court on the required "reasonably certain" basis, or in fact, on any basis at all short of sheer speculation.

HUTCHINSON, J., joins this Opinion in Support of Affirmance and files an Opinion in Support of Affirmance.

## OPINION IN SUPPORT OF AFFIRMANCE

HUTCHINSON, Justice.

In his opinion in support of affirmance, Mr. Justice Flaherty distinguishes an "option" from an "option agreement." For the following reasons I believe that distinction supplies an adequate alternative supporting ground for the lower court's opinion that these parties did not contract. I therefore join him in support of affirmance.

An option agreement, although it may seem to have only the characteristics of an offer, is nevertheless a contract. As a contract, the option agreement requires contract for-

malities, including consideration.[1]  In cases involving the
sale of goods, the U.C.C. has modified the common law of
offer and acceptance by creating what it calls firm offers in
§ 2–205, 13 Pa.C.S. § 2205, which bind the offeror, in a
limited sense, without consideration.  Such an offer, if it
states that it will be held open for a definite time, not in
excess of a statutorily limited period, does not fail for lack
of consideration, *i.e.* it is not revocable during the period set
up to the statutory limit.  This Code section limits the time
a firm offer can be held irrevocable to three months.
Option contracts, however, are not governed by 13 Pa.C.S.
§ 2205.  The firm offer which Code § 2–205 makes irrev-
ocable for a limited time is sometimes loosely called an
"option," but it has a different character than the option
contract recognized at common law.  The Code discloses no
legislative intent to eliminate the option contract, with its
requirement of consideration.  Hence, the necessary distinc-
tion between the "option" which is in reality a firm offer
and the option contract.

In this case, appellee may have extended a firm offer to
Bethlehem.  The letter set forth in Exhibit PX–4 stated that
its offer would be firm and irrevocable until December 31,
1968, five months beyond the U.C.C. limitation.  Because
Bethlehem did not accept within the three-month limit the
Code sets, Litton's firm offer became revocable after July
25, 1968.  Bethlehem's letter of December 31 may be treat-
ed as an attempt to accept the original offer.  As an
acceptance of a firm offer it came too late.  If timely,
however, as a common law acceptance of an unrevoked
offer for an option contract, it required consideration.  By
conforming to the requirements of § 2205 Bethlehem could
at best only tender a new firm offer, this one subject to
Litton's, not Bethlehem's, timely acceptance.  While Lit-
ton's counter-signature on this December 31 letter from
Bethlehem comes within the Code's three-month irrevocabil-
ity period if it is itself considered a firm offer and not an

1.  This issue is a matter of law which is subject to appellate resolution.

acceptance of Litton's expired firm offer, the underlying option contract must still be supported by consideration.

Thus, although Litton's counter-signature on this letter may arguably evidence an intent to accept a firm offer from Bethlehem and create an option contract, it is nevertheless ineffective to do so. Consideration was lacking because Bethlehem offered no payment or other consideration for the option contract, either in December of 1968 or at any time. In short, there was no exchange and Bethlehem remained free to act entirely in accordance with its own will, judgment and interest. It would bind Litton, while leaving itself free. The acceptance here did not supply consideration in the form of a promise because Bethlehem did not commit itself to purchase any vessels, or undertake any obligation. It was free to let the option lapse. This lack of consideration precludes the offer, firm or otherwise, from ripening into a contract by either party's timely acceptance. This is so, not because Bethlehem's promise was illusory or because there was no mutuality of obligation, but because Bethlehem made no promise at all. The simple problem with Bethlehem's case is that it did not offer to buy any additional ships now or pay for the right to require Litton to make one in the future under the terms of Litton's offer, whatever those terms may be. *See* Restatement (Second) of Contracts, § 79 comment f; § 87.

Bethlehem's assertion, that the option is part of one overall contract for the construction of ore ships and thus supported by the consideration relating to the ceremonial contract for the construction of the CORT, is not in accordance with the language of PX–4. That document says "we hereby extend to you an offer to enter into an option agreement to have us construct for you from one to five additional vessels in accordance with the specifications covering the construction of a self-unloading boat carrier for Bethlehem Steel Corporation. (No. Y 917) Dated March 1968, . . . ." By that language it becomes plain that there was no intention to make the option a part of an overall contract for the construction of ships but simply the exten-

sion of an offer to contract separately for additional ships. This becomes even plainer when we consider Litton's agreement to the extension of an additional so-called shorter term option to Bethlehem for the purchase of two ships.

I agree with Bethlehem that it is unnecessary to have a separate consideration for an option which is part of one overall transaction, and that such an option need not be a part of the writing setting out the terms of the main agreement. It is necessary that both writings be intended as part of one overall agreement supported by a single consideration. No such intention appears from the language of PX–4 or its relationship to the other documents. Indeed, its language speaks to an irrevocable offer to enter into an independent option agreement. As such, that agreement required a separate consideration.

I have also carefully considered Bethlehem's argument that we can find consideration for an option contract in the form of promissory estoppel or detrimental reliance under § 90 of Restatement (Second) of Contracts. In that connection we are referred to expenses which Bethlehem "obviously incurred" in its efforts to obtain additional ships from Litton. These obvious expenses are not specified and for them we are referred only to Bethlehem's offer to perform the obligations specified in the exchange of letters. However, these tenders of performance come approximately five years after December 31, 1968, the latest date on which the contract could have been created, leaving nothing to show significant detriment or restrictions on Bethlehem's will during the intervening five years. Under such circumstances I do not believe § 90 furnishes a basis for finding the detrimental reliance which may be substituted for the consideration otherwise necessary to support this contract.

Such a lack of consideration or a substitute for it aborts any intended contract, despite the provisions of U.C.C. § 2–204(3), 13 Pa.C.S. § 2204(c). That section modified the common law rule that a contract which lacks a material term was too indefinite to be enforced. In such cases the Code saves the contract by implying a good faith obligation

to agree more precisely on the nature of the indefinite term. We might speculate that good faith discussions by these parties would have produced mutual agreement on an index commonly acceptable for long term ship building contracts. However, no such further negotiation would supply consideration. It could have been supplied only if Bethlehem was required to pay or promise something. In the absence of Bethlehem's payment or promise, a promise by Litton could not create a contract.

Thus, whether or not the parties intended to be bound by the writings, an issue on which considerable deference is due the fact finder, there is no evidence on the record to show that the purported contract would have been supported by consideration. On this alternate ground I agree with Mr. Justice FLAHERTY that the orders of the courts below must be affirmed.

## OPINION IN SUPPORT OF REVERSAL

ZAPPALA, Justice.

This protracted litigation, following four years of pre-trial sparring, a nine-month trial involving over 12,000 pages of testimony and more than 500 exhibits, and three years pending argument and reargument in the Superior Court, now comes to this Court for decision. Ironically, the central legal issue is not complex. The question before the Court is whether or not there was an option contract between the parties.

The focus of the documentary and testimonial evidence at trial was a pair of letters, the first from Litton to Bethlehem dated April 25, 1968, and the second from Bethlehem to Litton dated December 31, 1968, respectively designated Plaintiff's Exhibits (PX–) 4 and 1. PX–4 was delivered at the time the parties ceremoniously executed a ship construction contract whereby Litton agreed to construct and Bethlehem agreed to purchase a one thousand-foot self-unloading ore carrier for approximately 18 million dollars. This ship was unique because of both its size and its original

self-unloading capabilities, and represented Litton's first attempt at ship construction through its new Lake Erie shipyards. In this ship construction contract, Bethlehem was given the right of first refusal as to any additional such vessels which Litton might later construct. Furthermore, a short-term option agreement expiring in October, 1968, under which Bethlehem could purchase up to two more ships, was entered into as part of this overall transaction. These circumstances constituted the setting within which the letters in question were exchanged.

The letter from Litton to Bethlehem read as follows:
Bethlehem Steel Corporation
Bethlehem, Pennsylvania
Attn: Ralph K. Smith
Gentlemen:

Reference is made to the ship construction contract signed by our companies this date for the construction by use of a 1,000' self-unloading ore vessel for you. Reference is also made to my letter to you of this date extending to you an option to purchase either one or two additional vessels upon the terms therein set forth:

*We hereby extend to you an offer to enter into an option agreement to have us construct for you from one to five additional vessels* in accordance with "Specifications covering the Construction of a Self-Unloading Bulk Carrier for Bethlehem Steel Corporation" (Number Y 917) dated March 1968, addendum number 1 thereto dated March 28, 1968 and addendum number 2 thereto dated April 17, 1968. *This offer to enter into an option agreement shall be firm and irrevocable until December 31, 1968 at 5:00 p.m. E.S.T.*

The terms of the option agreement are to be as follows:
(a) The specifications for the vessels shall be the specifications referred to above, except for mutually agreeable reduced test schedules of the vessels, if the testing of the vessel to be delivered under the contract executed this date proves successful.

(b) *Bethlehem to have the right at any time within five years after the effective date of the option agreement to order from one to not more than a total of five vessels,* for delivery within 24 months from the date of the order for the first vessel ordered and for delivery within 24 months plus 4 months for each additional vessel ordered within any one calendar year; provided however no vessel shall be scheduled for delivery between November 31 [sic] and March 31.

(c) The price of the vessels shall be as follows:

| | | | |
|---|---|---|---|
| 1st | vessel | ordered | $22,400,000.00 |
| 2nd | ” | ” | $21,400,000.00 |
| 3rd | ” | ” | $20,400,000.00 |
| 4th | ” | ” | $19,400,000.00 |
| 5th | ” | ” | $18,400,000.00 |

(d) The vessel prices are subject to escalation for both labor and material for a base price of $20,400,000.00 for each vessel and based upon Fourth Quarter 1968 mutually agreed upon index such as:

Material—"Material index for Bureau of Ships steel vessel contracts" furnished to the Naval Ship Systems Command by the Bureau of Labor Statistics of the U.S. Department of Labor.

Labor—"Index of Changes in straight-time average hourly earnings for selected shipyards" (June 1962– 100) for steel ship construction, furnished to the Naval Ship Systems Command by the Bureau of Labor Statistics of the U.S. Department of Labor.

*At the time of exercise of the option for any vessel,* the escalation shall be computed to the date of contract execution, and *an appropriate contract clause will be included therein providing for quarterly escalation* thereafter. *We will furnish you the labor and material percentages subject to escalation by May 15, 1968.*

(e) The terms, contracts and conditions of the ship construction to be in accordance with the attached terms and conditions and any other mutually agreed to terms and conditions and shall contain a clause giving

to Bethlehem the right to cancel at any time upon the payment of all of our costs incurred to date of cancellation, including similar vendor and subcontractor cancellation charges, plus 15% of the costs.

Very truly yours,
George K. Geiger

Plaintiff's Exhibit 4. (Emphasis added).

On May 8, 1968, Litton forwarded "the labor and material percentages subject to escalation" in accordance with paragraph (d) of PX–4. That letter read as follows:

Bethlehem Steel Corporation
Bethlehem, Pennsylvania
Attention: Mr. Ralph K. Smith
Gentlemen:

Reference is made to the letter delivered to you by Mr. George K. Geiger of Erie Marine, Inc. on April 25, 1968, *offering to enter into an agreement giving you the right to purchase five (5) additional one thousand foot ore boats* and providing that we would furnish you the percent of labor and material included in the price, $20,-400,000.00 for each vessel, subject to escalation. These percentages are as follows:

(a) The percent of the escalatable price subject to escalation for material is 64.7%.

(b) The percent of the escalatable price subject to escalation for labor is 28.1%.

Very truly yours,
Ellis B. Gardner
Senior Vice President

Plaintiff's Exhibit 5. (Emphasis added).

Another letter from Litton to Bethlehem clarified the status of the discussions between the parties as of November of 1968:

November 29, 1968
R.K. Smith, Ass't. General
Purchasing Agent
Bethlehem Steel Corporation
Bethlehem, PA 18016

Dear Mr. Smith:

In reply to your verbal request at a meeting held on November 26, 1968, at our facility, *the offer to enter into an option agreement made by Erie Marine, Inc. to Bethlehem Steel Corporation in a letter dated April 25, 1968 was to remain open until the end of calendar year 1968. The agreement would give Bethlehem the right to order from one to five vessels at stated prices, subject to escalation, at any time within five years* for delivery within 24 months of the date of the order for the first vessel ordered, and for delivery in 24 months plus four months for every additional vessel ordered within one calendar year; provided, however, no vessel shall be scheduled for delivery between November 30th and March 31st.

*The terms and conditions from the Ship Construction Contract pursuant to this option agreement were to be in accordance with the sample form of contract, plus any additional terms and conditions mutually agreed to at the time of negotiations.* The sample form of contract did not contain a liquidated damages provision, nor did it include any guarantees for defective workmanship or material, speed, dead weight, fuel comsumption, etc.

Moreover, the Ship Construction Contract dated April 25, 1968, Article 4(c) granted your company an option within 60 days of receipt of our quarterly projected schedule for a period of five years, to enter into a contract for any vessel shown on subject schedule which you had not previously had an option to contract for. This contract for additional vessels will be based upon price, time of delivery, and other terms and conditions that we can mutually agree upon at the time it is negotiated by both parties. Bethlehem's willingness to enter into an option agreement pursuant to our letter dated April 25, 1968, will

not impair or jeopardize any of its rights under the option contained in Article 4(c) of the Ship Construction Contract. If there is any additional information or answers to any questions that you may require, please call Mr. Clifford Roth, Division Counsel, who will be available at your convenience.

Sincerely yours,

ERIE MARINE, INC.

George K. Geiger

President and General Manager

Plaintiff's Exhibit 33. (Emphasis supplied).

Finally, on December 31, 1968, Bethlehem delivered a letter to Litton which was substantially similar to PX–4, the original letter from Litton to Bethlehem of April 25, 1968. This letter contained "the labor and material percentages subject to escalation" as supplied by PX–5, and contained a request by Bethlehem for Litton's acknowledgment of the terms as set forth in the letter, which acknowledgment was signed. This letter read in full as follows:

Mr. G.K. Geiger

President

Erie Marine, Inc.

Div. of Litton Industries

Holland Street

Erie, Pennsylvania 16512

Gentlemen:

This will confirm our several discussions and exchanges of correspondence in connection with our options for the construction by you of additional 1,000 foot self-unloading bulk vessels.

*We hereby accept your offer of an option to have you construct for us from one to five additional vessels* in accordance with "specifications covering the construction of a self-unloading bulk carrier for Bethlehem Steel Corporation" (No. Y 917) dated March 1968, Addendum No. 1 thereto dated March 28, 1968 and Addendum No. 2 thereto dated April 17, 1968. We understand that the terms of this option are as follows:

(a) The specifications for the vessels shall be the specifications referred to above, except for mutually agreeable reduced test schedules of the vessels, if the testing of the vessel to be delivered under the contract between Bethlehem Steel Corporation and Erie Marine, Inc. executed April 25, 1968 proved successful.

(b) Bethlehem to have the right at any time within five years after the effective date of the option agreement to order from one to not more than a total of five vessels, for delivery within 24 months from the date of the order for the first vessel ordered and for delivery within 24 months plus 4 months for each additional vessel ordered within any one calendar year; provided however no vessel shall be scheduled for delivery between November 31 and March 31.

(c) The price of the vessels shall be as follows:

| | | | |
|---|---|---|---|
| 1st | vessel | ordered | $22,400,000.00 |
| 2nd | " | " | $21,400,000.00 |
| 3rd | " | " | $20,400,000.00 |
| 4th | " | " | $19,400,000.00 |
| 5th | " | " | $18,400,000.00 |

(d) The vessel prices are subject to escalation for both labor and material for a base price of $20,400,000.00 for each vessel and based upon Fourth Quarter 1968 mutually agreed upon index such as:

Material—"Material index for Bureau of Ships steel vessel contracts" furnished to the Naval Ship Systems Command by the Bureau of Labor Statistics of the U.S. Department of Labor.

Labor—"Index of changes in straight-time average hourly earnings for selected shipyards" (June 1962–100) for steel ship construction, furnished to the Naval Ship Systems Command by the Bureau of Labor Statistics of the U.S. Department of Labor.

At the time of exercise of the option for any vessel, the escalation shall be computed to the date of contract execution, and an appropriate contract clause will be included therein providing for quarterly escalation there-

after. The labor and material percentages subject to escalation are as follows:

Labor     –   28.1%
Material  –   64.7%

(e) The terms and conditions of the ship construction contract are to be in accordance with the attached sample form of ship construction contract and any other mutually agreed to terms and conditions and shall contain a clause giving to Bethlehem the right to cancel at any time upon the payment of all of your costs incurred to date of cancellation, including similar vendor and sub-contractor cancellation charges plus 15% of such costs.

It is further understood that Bethlehem's agreements to accept the foregoing option does not impair or jeopardize any of its rights under the option contained in Article 4(c) of the Ship Construction Contract between Erie Marine, Inc. and Bethlehem Steel Corporation dated April 25, 1968.

We would appreciate your concurrences in the foregoing by signing and returning to us the enclosed copy of this letter.

Very truly yours,
BETHLEHEM STEEL
CORPORATION
By R.K. Smith
Asst. Gen. Purchasing Agent

AGREED TO:
ERIE MARINE, INC.
by George K. Geiger, President

The Court of Common Pleas of Allegheny County in its Findings of Fact concluded that on April 25, 1968, Litton and Bethlehem were in agreement that "the concept of escalation would be included in any ship construction contract they might subsequently agree upon," although they did not agree at that time on the terms of such escalation, nor were they then prepared to negotiate on such a clause, recognizing it as a subject for future negotiation and agree-

ment. Findings of Fact 8, 9, 10; Opinion at 6. *See also* Findings of Fact 15, 16, 17; *Id.* at 7. The court further found that "[i]n the shipbuilding industry, the terms of an escalation clause are written in detail in the ship construction contract." Finding of Fact 19; Opinion at 7. After an extensive discussion about the nature of escalation clauses, the related concept of apportionment, and the importance of such terms in the industry in general and to the parties in particular, the court found that the language of the letters "is indicative that the parties did not expect the agreement to be final until they negotiated and mutually agreed upon escalation." Opinion at 16. The court applied an indeterminate hybrid of common law cases and Uniform Commercial Code provisions and concluded that "[b]ecause of the nature of the gaps as has been discussed in the Option [sic], it would appear that only the parties are the exclusive entities capable of filling in the gaps. Because these gaps are so wide, the Court cannot make a new contract for the parties." Opinion at 38. The Superior Court affirmed, in large part on the Opinion of the lower court.

At the outset of the analysis, it is well to note that the scope of our review of a finding on contractual intent, such being a finding of fact, is narrowly circumscribed. We may not disturb the facts as found by the trial court so long as they are supported by competent evidence and are not the result of an abuse of discretion. *See Field v. Golden Triangle Broadcasting Inc.,* 451 Pa. 410, 305 A.2d 689 (1973) *cert. den.,* 414 U.S. 1158, 94 S.Ct. 916, 39 L.Ed.2d 110 (1974); *Goldman v. McShain,* 432 Pa. 61, 247 A.2d 455 (1968). Although purporting to apply the "abuse of discretion" standard of review in assessing the lower court's findings on contractual intent, the Opinion in Support of Affirmance acknowledges that "the trial court made *no* factual finding that the parties intended not to contract." At 585 n. 2 (Emphasis added). Indeed the trial court expressly denied having determined that there was no contract and specifically stated that its determination was simply that "there was no evidence in the record for [sic]

which the Court could fill in the gaps." Despite this express statement, Justice Flaherty's Opinion in Support of Affirmance adopts what is described as a "fair inference" drawn from the "Discussion" section of the lower court's opinion "that no contractual intent existed." *Id.* I cannot agree that this Court is bound to accept such "inferences" from the court's discussion of the facts in the same manner as we are bound to accept the facts themselves. Moreover, "we are always free, and indeed are duty bound, to modify erroneous applications of law...." *Hatalowich v. Redevelopment Authority of Monessen,* 454 Pa. 481, 484, 312 A.2d 22, 23 (1973). I find that in this case the trial court erred in the choice of legal theory according to which it assessed the evidence presented and the facts found.

It appears from an examination of the trial court's Opinion that the court viewed the evidence with an eye toward determining whether the April 25th and December 31st letters were sufficiently detailed as to constitute an agreement for the purchase and sale of ships. This approach is erroneous in two respects. First, it is clear from the pleadings that Bethlehem sought recovery on the grounds that Litton had breached not simply a ship construction contract, but an option contract. Although the option agreement alleged had as its subject the construction and sale of ships, it must stand as a separate agreement for purposes of legal analysis. Given the nature of option agreements as being preliminary in relation to final agreements, the trial court's blurring of the distinctions between the two was a fundamental error. Second, insofar as it sought to determine the intent of the parties regarding a ship construction contract, the trial court erred in failing to adequately distinguish between the alleged contract between the parties and the formal writing which was to evidence that contract. There is no dispute that the parties did not execute a final document containing all the terms which the parties contemplated would constitute their final ship construction agreement. To say this, however, is not to say that the parties did not have an enforceable contract.

Neither is it to say that the parties' contractual intent as to ship construction is properly determined by viewing the evidence solely in relation to the documents which the parties had executed regarding the option agreement.

"An option contract is a promise which meets the requirements for the formation of a contract and *limits the promisor's power to revoke an offer.*" Restatement (Second) of Contracts § 25 (emphasis added).[1] Reduced to its simplest elements, PX–4 contains an offer by Litton to Bethlehem of an option agreement. (This offer was, by its own terms, made irrevocable until December 31, 1968.) The basic terms of the offer which was to be kept open by this option agreement were that Litton would build up to five ships for Bethlehem at any time over the five years following acceptance of the option agreement, according to certain specifications, and at certain prices which would be subject to escalation based upon an index to be mutually agreed upon. In other words, by PX–4 Litton made an offer to Bethlehem to build up to five ships and gave Bethlehem the opportunity to make this offer irrevocable for a period of five years by offering an option agreement. Bethlehem unequivocally accepted the offered option agreement by its letter of December 31, 1968, PX–1[2]. Once again it is emphasized

1. To the extent that its claim is based on an asserted breach of an option contract, Bethlehem's argument that the Uniform Commercial Code, 13 Pa.C.S. § 1101 et seq., applies to this case must be rejected. [References to the Uniform Commercial Code are to the present codified version, re-enacted by the Act of November 1, 1979, P.L. 255, No. 86, although the identical predecessor provisions were in effect at the time of the events in the case at bar. *See,* Act of April 6, 1953, P.L. 3; re-enacted October 2, 1959, P.L. 1023.] With regard to option contracts, or in the terms of the Code "firm offers", a maximum time limit of three months has been set during which firm offers remain irrevocable under the Code. 13 Pa.C.S. § 2205. Long term options are governed by general rules of contract law. *See* 13 Pa.C.S. § 2205, Comment 3; 13 Pa.C.S. § 1103 (principles of law and equity supplement Code unless displaced by particular provisions).

2. In examining the language of these letters, the trial court stated that Litton appears to offer Bethlehem the opportunity to enter into an option agreement. By accepting this offer, if such an acceptance would have any legal effect, Bethlehem would not bring into being an option agreement, but would have the right to *enter into* an

that the sole purpose of this agreement, the option agreement, was to keep open for five years Litton's offer to build up to five ships for Bethlehem.

Within this analytic framework, the parties focus their arguments on whether, given the offer and acceptance of an option, there existed valid consideration to support the option contract and bind Litton to keep the offer open for five years. This issue need not be decided, however, because until the time when Bethlehem attempted to "exercise its option" and accept Litton's offer to build ships, Litton never gave indication that it had revoked the offer. Indeed, following Bethlehem's letter of August 21, 1973 (Defendant's Exhibit 7B) indicating Bethlehem's intention to exercise its option, Litton responded by letter on August 29, 1973 (Plaintiff's Exhibit 36) stating what action it was taking on the basis of the option agreement. That letter read in part:

> We acknowledge receipt of your letter dated August 21, 1973 in which you indicate that you are planning to exercise your options pursuant to the option letter agreement between us dated December 31, 1968.
>
> "Based on this, we have initiated a full-scale estimate of the current cost to duplicate Hull 101, including start-up costs....
>
>    *  *  *  *  *  *
>
> "Your current indication that you now plan to exercise options under the December 31, 1968 letter agreement

option agreement. On its face, this sentence gives Bethlehem no more than the right to accept an offer to agree." Opinion at 26–27 (emphasis in original). This interpretation strains the language of the document beyond credulity. Litton clearly offered an option agreement. In this regard, the trial court noted that in PX–1 Bethlehem responded by stating "[w]e hereby accept your *offer of an option* ..." (emphasis added), but chose to characterize this as "an attempt to accept more than Litton offered," Opinion at 27, a characterization accepted by Justice Flaherty's Opinion in Support of Affirmance, Slip op. at 11. Even were we to accept this clearly erroneous interpretation, however, we would be required to find that PX–1 constituted a counter-offer of an option whose terms Litton accepted by executing the requested acknowledgment. See 13 Pa.C.S. § 2207.

makes it necessary for us to set aside our plans for the disposition of our shipyard here at Erie, and to incur the additional costs to reactivate the facility and bring it back to a level of efficient construction operation.

Thus whether Litton was contractually bound to keep the shipbuilding offer open on the basis of the letters exchanged in 1968, or whether no such contractual obligation existed due to lack of consideration, the evidence establishes that Litton in fact *did* keep the offer open for the five year period and did not revoke it prior to Bethlehem's attempted acceptance.

It having been determined that Litton's offer to build up to five ships within the five years beginning December 31, 1968 was still open at the time of Bethlehem's purported acceptance in 1973, the existence of a contract or not turns upon whether the offer was validly accepted and whether there was consideration.

There is no intimation that Bethlehem's letters of November 16 and December 26, 1973, by which Bethlehem "exercised its option" to order first two vessels and then another, were an improper manner or medium of acceptance. Nor can there be serious argument that the mutual promises exchanged by way of the offer and acceptance constituted valid and sufficient consideration for making the contract binding.

Not to be overlooked is the longstanding principle of contract law that the offeror is the master of his offer and has complete power to control the nature of the agreement by the terms of the offer he makes. In the present case, Litton extended its offer to build ships for Bethlehem in terms which included a stated price but which also indicated that the stated price would be subject to escalation according to an index to be agreed upon by the parties. If Litton had intended its offer to be more definite as to price in order to protect itself from potential losses it could readily have made it so by conveying the offer in other terms. It did not do so. Having set out an offer in terms which contemplated further agreement on some particulars, Litton should not be heard to complain that the contract resulting

from acceptance of the offer is too indefinite to be enforced because of failure of the parties to reach such agreement.

We have previously accepted as the law of this Commonwealth the principle stated in Restatement (Second) of Contracts § 205 that "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." *Atlantic Richfield Co. v. Razumic*, 480 Pa. 366, 378 n. 7a, 390 A.2d 736, 742 n. 7a (1978) (referring to § 231 of Restatement (Second) of Contracts Tent. Draft No. 5 1970 now § 205). Likewise, the Uniform Commercial Code provides that "[e]very contract ... within this title imposes an obligation of good faith in its performance or enforcement," 13 Pa.C.S. § 1203.

Application of this legal analysis changes the relative significance of the facts as found by the trial court. The most significant fact is not that the important escalation clause of the ship construction contract was never agreed upon, or that the parties would not have executed a written ship construction contract without agreement on an escalation index. Rather the most important finding is that Bethlehem was willing to consider a number of indices for the escalation clause, but Litton "did not intend to develop any language regarding a proposed ship construction contract," Findings of Fact 30, 31, 33; Opinion at 9–10. In effect, when Bethlehem sought to "exercise its option" by accepting Litton's outstanding offer to build ships, Litton prevented execution of a ship construction contract by failing to bargain in good faith on the open terms. This constituted a breach of the agreement formed by Bethlehem's 1973 letter acceptance of Litton's offer contained in the letter of April 25, 1968 and renewed by Litton's agreement to its restatement in the letter of December 31, 1968.

Justice Flaherty's Opinion in Support of Affirmance also errs, as did the trial court, in the manner in which it interprets and applies the "open terms" provisions of the Uniform Commercial Code. Section 2204 provides:

### § 2204  Formation in General

(a) General rule—A contract for sale of goods may be made in any manner sufficient to show agreement, includ-

ing conduct by both parties which recognizes the exist-ence of such a contract.

\* \* \* \* \* \*

(c) Effect of open terms—Even though one or more are left open a contract for sale does not fail for indefinite-ness *if the parties have intended to make a contract and* there is a *reasonable certain basis* for giving an appropriate remedy.

13 Pa.C.S. § 2204. (Emphasis added). Subsection (c), ex-plains the Comment,

states the principle as to "open terms" underlying later sections of the Article. If the parties intend to enter into a binding agreement, this sub-section recognizes that agreement as valid in law, despite missing terms, if there is *any* reasonably certain basis for granting a remedy. *The test is not certainty as to what the parties were to do nor as to the exact amount of damages due the plaintiff.*

(Emphasis added).

Section 2305 provides

§ 2305.  Open price term

(a) General rule.—The parties if they so intend can con-clude a contract for sale even though the price is not settled. *In such a case the price is a reasonable price at the time for delivery if:*

(1) nothing is said as to price;

(2) *the price is left to be agreed by the parties and they fail to agree;*

(3) the price is to be fixed in terms of some agreed market or other standard as set or recorded by a third person or agency and it is not so set or recorded.

13 Pa.C.S. § 2305. (Emphasis added).

The trial court concluded that "because of the nature of the gaps ... the parties are the exclusive entities capable of *filling the gaps*," and "[b]ecause the gaps are so wide the Court cannot *make a new contract* for the parties." Opin-ion at 38. (Emphasis added). Justice Flaherty's Opinion in

Support of Affirmance similarly finds that "there is no 'reasonably certain' way to know which of the thousands of possibilities for constructing an index the parties would have agreed upon." Slip op. at 22. Were the remedy being sought specific performance of a contract, these difficulties would indeed make the determination of an "appropriate remedy" well nigh impossible. Because there is an available remedy in monetary damages, however, the proper inquiry is not what the parties would have agreed to, but what is reasonable. The court's role in this situation is not to form a contract as the parties would have done, but to determine a remedy for the wrongful failure of the parties to reach agreement. The result of this confusion is painfully demonstrated in the present case, where it is not even the entire price term which was left open, but only the "extras" to be added on to an already agreed upon price. The court would have no difficulty in determining from the stated base price of $20,400,000 per ship that an "appropriate remedy" for a breach involving three ships would be *at least* $61,200,000. Yet because of the open escalation clause of the price term, the result is that *no* remedy is awarded. I find this result to be absurd and unconscionable.

For the foregoing reasons I would reverse the Order of the Superior Court. Because the trial court bifurcated this case as to liability and damages, I would remand the case for determination of damages on Bethlehem's claim against Litton. No appeal having been taken from the court's finding that Litton had failed to prove count one of its counterclaim, the claim in trespass based on Restatement (Second) of Torts Section 525, the court's holding must stand as the law of the case. The lower court having failed to reach the merits of count two of the counter-claim, that claim in assumpsit being premised upon a finding that a binding and enforceable agreement existed under the terms of PX–1, I would allow Litton to pursue count two of its counterclaim in the trial court upon remand.

LARSEN, J., joins in this Opinion in Support of Reversal.