**Emil SCHILLACHI, Jr., Plaintiff,**

v.

**FLYING DUTCHMAN MOTORCYCLE CLUB, Luke Zechman, Honda Motor Company Limited of Japan, American Honda Motor Co., Inc., American Motorcyclist Association, Schuykill County Ambulance Service, Schuykill Haven Lions Ambulance Service, "ABC Co.", and "John Doe", Defendants.**

Civ. A. No. 88–7186.

United States Dist. Court,
E.D. Pennsylvania.

Oct. 19, 1990.

Daniel B. Juyett, Stevens & Lee, Reading, Pa., for plaintiff.

Eugene J. Maginnis, Jr., Cozen & O'Connor, Philadelphia, Pa., for defendants Flying Dutchman Motorcycle Club, Zechman and American Motorcyclist Ass'n.

Robert St. Leger Goggin, Marshall, Dennehey, Warner, Coleman & Goggin, Philadelphia, Pa., for defendants Honda Motor Co. Ltd. of Japan and Honda Research & Development Ltd. of Japan.

Robert J. Casey, Jr., Mylotte, David & Fitzpatrick, Philadelphia, Pa., for defendant Schuylkill Haven Lions Ambulance Service.

## MEMORANDUM

TROUTMAN, Senior District Judge.

On September 21, 1986, plaintiff Emil Schillachi, Jr., was racing his Honda All–Terrain Vehicle ("ATV") in an ATV race at the Flying Dutchman Race–Track. An accident occurred in which plaintiff suffered severe injuries. Plaintiff filed the above action on September 16, 1988, alleging that his injuries were, in part, the result of the failure of defendants Flying Dutchman Motorcycle Club, Luke Zechman, and American Motorcyclist Association ("Race–Track defendants") to maintain the racetrack in a proper and safe condition, and failure to properly inspect, examine or otherwise determine whether plaintiff's ATV was in a proper and safe condition.

On August 18, 1989 the Race–Track defendants filed a motion for summary judgment, contending that plaintiff executed releases of liability when he signed the papers that allowed him to participate in the race. Plaintiff contends that when the Race–Track defendants gave him the papers, including the releases, to sign before he would be allowed to race, the Race–Track defendants did not fully explain the nature of the papers. Instead, plaintiff claims that the statements of the Race–Track defendants lead him to believe that the papers were given to him simply for obtaining membership in the American Motorcyclist Association ("AMA"), and that signing was a mere formality.

The exhibits attached to the Race–Track defendants' motion for summary judgment indicates that plaintiff signed two releases. The first release, in substantially smaller print than the rest of the form, reads:

I understand that all benefits become effective upon receipt of my membership card, except the right to participate in AMA–sanctioned meets, which becomes effective immediately. I understand that $7.50 of my Full Membership dues is for my monthly *American Motorcyclist.* AMA benefits may be changed at any time by the AMA Board of Trustees. I understand that the AMA cannot assume responsibility for any aspect of my safety and that if I participate in any sanctioned meet, I do so voluntarily on my own assessment of my own ability, the track course and all facilities and conditions, assuming all risk; and, I release and hold the AMA harmless for any injury or loss to my person or property which may result therefrom.

Race–Track defendants' Exhibit "C". The second release, again written in substantially smaller print than the rest of the form, reads as follows:

I, hereby release, and agree to hold harmless the American Motorcyclist Association, American All–Terrain Vehicle Association, the promoters, the owners and lessees of the premises, the participants, and the officers, directors, officials, representatives, agents and employees of all of them, of and from all liability, loss, claims and demands that may accrue from any loss, damage, or injury (including death) to my person or

property, in any way resulting from, or arising in connection with this event, and whether arising while engaged in competition or in practice or preparation therefor, or while upon, entering or departing from said premises, from any cause whatsoever, I know the risk and danger to myself and property while upon said premises or while participating or assisting in this event, so voluntarily and in reliance, upon my own judgment and ability, and I thereby assume all risk for loss, damage or injury (including death) to myself and my property from any cause whatsoever.

Race–Track defendants' Exhibit "D". The circumstances under which the subject documents were executed are, according to plaintiff's brief in opposition, important material facts upon which this Court may base a denial of the Race–Track defendants' motion. The Court, however, finds this unpersuasive, and for the following reasons, will grant the Race–Track defendants' motion for summary judgment.

## I. *Summary Judgment.*

■ Summary judgment shall be granted when there are no genuine issues of material fact in dispute and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). To defeat summary judgment, an issue of fact in dispute must be both genuine and material, *i.e.* one upon which a reasonable factfinder could base a verdict for the non-moving party and one which is essential to establishing the claim. *Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court is not permitted, when considering a motion for summary judgment, to weigh the evidence or make determinations as to the credibility thereof. The Court's sole function, with respect to the facts, is to determine whether there are any disputed issues and, if there are, to determine whether they are both genuine and material. *Id.* The Court's consideration of the facts, however, must be in the light most favorable to the party opposing summary judgment and all reasonable inferences from the facts must be drawn in favor of

that party as well. *Tigg Corp. v. Dow Corning Corp.,* 822 F.2d 358 (3d Cir.1987).

■ In order to obtain a summary judgment, the proponent of the motion has the initial burden of identifying evidence, from the sources enumerated in Rule 56, which demonstrates the absence of a genuine issue of material fact. When confronted by a properly supported motion for summary judgment, the opposing party is required to produce, from the same sources, some contrary evidence which could support a favorable verdict.

## II. *Conflict of Laws.*

■ Although plaintiff's brief in opposition urges the Court to apply the law of New Jersey, the Court concludes that the law of Pennsylvania determines the effect of the exculpatory clause contained in the release. In support of his argument that New Jersey law is applicable, plaintiff cites *Griffith v. United Air Lines, Inc.,* 416 Pa. 1, 203 A.2d 796 (1964) which accepted the reasoning of *Babcock v. Jackson,* 12 N.Y.2d 473, 191 N.E.2d 279, 240 N.Y.S.2d 743 (1963) and quoted therefrom: "The merit [of a flexible choice of law rule] is that 'it gives to the place "having the most interest in the problem" paramount control over the legal issues arising out of a particular factual context' and thereby allows the forum to apply 'the policy of the jurisdiction "most intimately concerned with the outcome of [the] particular litigation".' (citation omitted)" *Griffith,* 416 Pa. at 22, 203 A.2d 796. *See also Compagnie des Bauxites de Guinee v. Argonaut–Midwest Insurance Co., et al.,* 880 F.2d 685 (3d Cir. 1989).

In the instant motion for summary judgment, the "problem" and "legal issue" is only the contractual validity and enforceability of the releases. The releases were signed in Pennsylvania, the accident occurred in Pennsylvania, and all relevant acts leading to the instant case occurred in Pennsylvania. The only event giving rise to the possible application of New Jersey law is the citizenship of plaintiff[1]. For

---

**1.** The Court notes that if this were the basis on

which it should apply New Jersey law, then one

these reasons, the Court concludes that Pennsylvania is most immediately concerned with the legal issues involved in this motion for summary judgment. Thus, Pennsylvania law regarding the validity and enforceability of the releases should apply in this case. It cannot be expected, as plaintiff argues, that the (possibly) more lenient law of New Jersey should follow New Jersey citizens any time they leave that jurisdiction and avail themselves of opportunities that lie in other states.

### III. *Pennsylvania Law Regarding Releases of Liability.*

The Pennsylvania Supreme Court set forth the conditions under which a release from liability is valid and enforceable in *Employers Liability Assurance Corp., Ltd. v. Greenville Business Men's Association*, 423 Pa. 288, 224 A.2d 620 (1966):

> Generally speaking, an exculpatory clause is valid if: (a) 'it does not contravene any policy of the law, that is, if it is not a matter of interest to the public or State....' [citation omitted]; (b) 'the contract is between private persons relating entirely to their own private affairs' [citation omitted]; (c) 'each party is a free bargaining agent' and the clause is not in effect 'a mere contract of adhesion, whereby [one party] simply adheres to a document which he is powerless to alter having no alternative other than reject the transaction entirely.' [citation omitted].
>
> Assuming, *arguendo*, that the instant exculpatory clause satisfies all three conditions and is valid, our case law requires that, even if valid, an exculpatory clause must meet certain standards [to be enforceable]....

*Id.* at 291–292, 224 A.2d 620.

### A. *Validity of the Releases.*

#### 1. *Public Policy.*

■ The public policy of the law of Pennsylvania regarding an exculpatory clause releasing the promoters of a race such as

involved here was summarized in *Grbac v. Reading Fair Co., Inc.*, 521 F.Supp. 1351 (W.D.Pa.1981) *aff'd* 688 F.2d 215 (3d Cir. 1982):

> [A] release in an agreement concerning participation in an automobile [or motorcycle] race does not contravene any policy of the law. Such a release has very little, if any, negative impact on the general population. Moreover, fewer promoters would be willing to hold automobile [or motorcycle] races if courts refused to permit them to limit their exposure to liability for racetrack accidents, in what is undeniably a dangerous sport.

*Id.* at 1355.

#### 2. *Private Affairs of the Parties.*

This release was entered into between the parties in relation to a purely private matter. In a similar case which turned on the issue of a release signed by a member of a racing team's pit crew, one Pennsylvania court analyzed the matter of "private affairs" thusly: "[T]he instant action does not involve a common carrier, a utility or quasi-public utility that supplies essential services, or a statute pertaining to health or safety but relates to private affairs of individuals." *Seaton v. East Windsor Speedway, Inc.*, 82 Berks L.J. 206, 210 (1990). In the instant case, the Court is not aware of any statute, regulation, or other government action which would take this release out of the realm of the parties' private affairs.

#### 3. *Free Bargaining Agent.*

Plaintiff here was not dependent upon racing his ATV for a living. Plaintiff was under no compulsion to compete in such races. This is not a case of one abusing a vastly superior bargaining power in its dealings with a party of proportionately ineffective bargaining power regarding the necessities of life. The fact that Race–Track defendants' may not have allowed plaintiff to participate in this particular hobby race does not render this release an

---

of the Race–Track defendants, AMA, would have a similar argument for the application of Ohio law as AMA appears to be a citizen of Ohio.

The same could be said of the other defendants in this action which could lead to the application of Japanese law.

adhesion contract. It is quite clear from the parties' brief and exhibits, that plaintiff could have continued to enjoy his racing interest in ATV's at the Port Jervis, New York, track without signing such a release. Plaintiff was not foreclosed from a necessity of life; plaintiff was not even foreclosed from a hobby.

Further, there is no evidence showing that plaintiff in fact tried to negotiate the terms of the release. The briefs and exhibits, rather, show that plaintiff did not even read the releases or forms. Considering this, the Court cannot logically draw an inference in favor of plaintiff that he attempted to negotiate the release terms and was subsequently put in a situation of having "no alternative other than to reject the transaction entirely" or to take it or leave it.

### 4. *Conclusion Regarding Validity.*

Considering that plaintiff has admitted in his deposition that he did indeed sign the releases that are currently at issue, and the foregoing analysis of the law and policy of Pennsylvania as set out by *Employers Liability,* this Court finds the releases to be valid. The analysis under the *Employers Liability* test now turns to the enforceability of the releases.

### B. *Enforceability of the Releases.*

■ The standards for enforceability laid out in *Employers Liability* are: (1) a release from liability must be construed strictly since they are not favorites of the law and, therefore, must spell out the intention of the parties with great particularity such that it shows the intent to release liability beyond a doubt, and (2) because the burden of establishing immunity from liability is on the party asserting such immunity, the release must be construed with every intendment against that party. *See Employers Liability,* 423 Pa. at 292–293, 224 A.2d 620; *Zimmer v. Mitchell and Ness,* 253 Pa.Super. 474, 385 A.2d 437, 439 (1978) *aff'd* 490 Pa. 428, 416 A.2d 1010 (1980).

### 1. *Intention of the Parties.*

The Pennsylvania Superior Court in *Mitchell and Ness* analyzed and found enforceable, a release in a ski rental agreement in which the renter accepted "full responsibility for any and all ... damage or injury". The Superior Court concluded that "[n]o clearer expression of intent to exculpate appellee is conceivable." *Mitchell and Ness,* 385 A.2d at 439. One of the releases at issue in the current case states "I, hereby release, and agree to hold harmless the [Race–Track defendants] ... from all liability, ... that may accrue from any ... injury (including death) to my person ..., in any way resulting from, or arising in connection with this event...." Race–Track defendants' Exhibit "D". The other release states that plaintiff assumes all risk and that he "release[s] and hold[s] the AMA harmless for any injury or loss to my person or property which may result" from the race. Race–Track defendants' Exhibit "C".

Plaintiff's brief in opposition to the motion raises an argument that because "neither purported release even mentions the word negligence or states in any way that defendants will be absolved for any acts of negligence", the releases "do not spell out with the specificity required the exculpation of the defendants for act of their own negligence." Plaintiff's Brief in Opposition at 9. The Pennsylvania Superior Court in *Mitchell and Ness* addressed this very same argument with respect to a release which exculpated a ski rental shop "from any liability for ... injury". The court in *Mitchell and Ness* stated that "[a]lthough we must interpret the contract strictly, we must also use common sense in interpreting this agreement. The mere fact that the word 'negligence' does not appear in the agreement is not fatal to [the Race–Track defendants'] positions." *Mitchell and Ness,* 385 A.2d at 439. The Superior Court concluded that "[t]o say that negligent conduct is not included in 'any liability' is patently incorrect." *Id.* 385 A.2d at 440 (emphasis in original). In the instant case, the release which absolves the Race–Track defendants includes the phrase "I release and hold the AMA harmless for *any* injury

..." Race–Track defendants' Exhibit "C" (emphasis added), and "I, hereby release, and agree to hold harmless [the Race–Track defendants], ... from *all* liability, ... from *any* ... injury (including death)...." Race–Track defendants' Exhibit "D" (emphasis added). Clearly, to say that *negligent conduct is not included* in the language of the releases currently in issue would be incorrect, as it was held to be in *Mitchell and Ness.*

To further support his position, plaintiff cites *Brown v. Racquetball Centers, Inc.,* 369 Pa.Super. 13, 534 A.2d 842 (1987). The Court concludes that *Brown* is not controlling. The release at issue in *Brown* was not as clearly stated as the releases at issue in the instant case. *Brown* involved a "slip and fall" that occurred in the shower area at a fitness club to which Mr. Brown was a member. With that particular release, Mr. Brown "assumed all risk of injury ... that may be sustained in connection with the stated and associated activities" of the club, and the club was released from all claims for injury sustained in "participation in those activities...." The court there found that the release "can more clearly be interpreted to relieve the Club of liability as the result of injuries sustained by a member while participating in certain activities of the Club." *Id.* 534 A.2d at 843. Mr. Brown suffered his injuries, not in an "activity of the Club", but while engaged in an ancillary activity. In the instant case, the releases clearly apply to "any sanctioned meet" and "in any connection with this event, and whether arising while in competition or in practice or preparation therefor". The releases, therefore, apply to the organized racing events put on by the Race–Track defendants, in which plaintiff suffered his injuries.

The intent behind the current releases is both clear and specific. Further, the deposition of plaintiff shows that he believed he was racing at his own risk. Plaintiff's Exhibit "C"; Race–Track defendants' Reply to Brief in Opposition at 6. In light of this, it would be unreasonable to conclude that, if the circumstances surrounding the signing of the releases were different, plaintiff would not have signed the releases. Plaintiff, although unaware of the effect of the releases, believed that he was racing at his own risk, which, in fact, is the effect of the releases. The releases did not alter plaintiff's perception of his own risk. The deposition of plaintiff also shows that he got up at 3:00 a.m. in order to arrive at the racetrack by 10:00 a.m.; that plaintiff's father thought it was dangerous, and that plaintiff himself saw accidents happening. Nevertheless, he continued to race because he "was there to race." Race–Track defendants' Reply to Brief in Opposition at 6. Adding plaintiff's strong desire to race to his own assessment of his risk confirms that the evidence permits only one reasonable inference, *i.e.,* that different circumstances would *not* have altered his signing of the releases. Therefore, plaintiff's intent is also clear. He was there to race, not to turn back, and thought himself to be racing at his own risk, which, indeed, he was.

IV. *Duty to Inform v. Duty to Read.*

■ Plaintiff states that he was not allowed the chance to knowingly negotiate the terms of the releases. The Court cannot understand how plaintiff could have negotiated terms which he chose not to read. The law of Pennsylvania is clear. One who is about to sign a contract has a duty to read that contract first. The law was summarized in *East Windsor Speedway,* supra:

"[I]t has been held that where a person sought to be bound by a writing has carelessly signed such writing without reading it, the court should not relieve such person from the results of his own gross negligence." [citing *Bessen Bros., Inc. v. Brooks,* 176 Pa.Super. 430, 107 A.2d 623 (1954)] In *T.W. Phillips Gas and Oil Co. v. Kline,* 368 Pa. 516, 518, 84 A.2d 301, 302 (1951), the court stated: "Where there is no allegation and proof of fraud or where there is no legal justification for failure to read a written contract on which suit is brought, failure to read is an unavailing excuse or defense and cannot justify avoidance, modification or nullification of the contract or any provision thereof[.]" Also see *Standard Venetian Blind Co. v. American Em-*

*pire Insurance Co.,* 503 Pa. 300, 469 A.2d 563 (1984). 8 Pennsylvania Law Encyclopedia, § 83, page 82 states: "It is common sense and an accepted rule of law that a person has a duty to read the contract before executing it, and his failure to do so will not excuse his ignorance of the contents".

*East Windsor Speedway,* 82 Berks L.J. at 211–212. There is no legal justification for plaintiff's failure to read the releases in the instant case. Any allegations of fraud stem from an alleged breach of a claimed reciprocal duty of the Race–Track defendants' to inform plaintiff of the contents of the releases. To accept plaintiff's argument that there is such a duty to inform in this case would essentially abrogate the law of Pennsylvania regarding plaintiff's duty to read. Plaintiff quotes *Delahanty v. First Pennsylvania Bank, N.A.,* 318 Pa.Super. 90, 464 A.2d 1243, 1251–52 (1983) which discusses fraud. In the passage quoted by plaintiff, the court states: "It has been said that fraud may induce a person to assent to something which he would not otherwise have done, or it may induce him to believe that the act which he does is something other than it actually is." Plaintiff's Brief in Opposition, at 6. As already seen, plaintiff thought he was racing at his own risk, and under this situation, Race–Track defendants could not have induced him to believe the act of signing the releases had any other effect than what plaintiff already thought. There is no allegation or argument that the Race–Track defendants lead plaintiff to believe that they would be liable in the event of an accident.

## V. *Conclusion.*

Under the law and facts, the Court finds that the releases of liability are valid as to the Race–Track defendants, and Race–Track defendants have met their burden on summary judgment. For this reason, judgment will be granted in favor of the Race–Track defendants and against the plaintiff.