**CGU**

v.

**TRAVELERS PROPERTY CASUALTY and Bethlehem Cardiothoracic Surgical Associates, P.C.**

No. CIV.A.99–CV–6387.

United States District Court, E.D. Pennsylvania.

Nov. 29, 2000.

Mark J. Hill, Robert J. Opalka, Robert J. Opalka & Associates, P.C., Philadelphia, PA, for Plaintiff.

Samuel J. Arena, Stradley Ronon Stevens & Young, Philadelphia, PA, for Defendant Travelers Property Casualty.

Mark H. Scoblionko, Scoblionko, Scoblionko, Muir, Bartholomew & Melman, Allentown, PA, for Defendant Bethlehem Cardiothoracic Surgical Associates.

### MEMORANDUM AND ORDER

JOYNER, District Judge.

This declaratory judgment action has been brought before the Court on motion

of the Plaintiff CGU for partial summary judgment with regard to its claims against Defendant Travelers Property Casualty Insurance Company ("Travelers"). For the reasons which follow, the motion shall be granted.

### History of the Case

This case has its origins in another civil action presently pending before this Court, captioned *Angelico, M.D. v. Lehigh Valley Hospital, Inc.*, 984 F.Supp. 308 (1997). In that action, the plaintiff, Dr. Angelico, contends that defendants Lehigh Valley and St. Luke's Hospitals, Panebianco–Yip and Bethlehem Cardiothoracic Surgical Associates conspired to eliminate him as a competitor in the market for coronary artery bypass graft surgeries in the Lehigh Valley area by defaming him, denigrating his surgical skills, and by depriving him of hospital staff privileges such that he could no longer perform surgeries in the Greater Lehigh Valley.

Shortly after receiving the complaint against it, Bethlehem Cardiothoracic Surgical Associates ("BCSA"), notified both CGU and Travelers of Dr. Angelico's lawsuit and requested that both companies provide it with a defense and indemnify it in connection therewith. In so doing, BCSA apparently believed that the predecessors of both companies had provided it with appropriate liability coverage during the time period(s) covered by Dr. Angelico's complaint. Plaintiff CGU, the successor in interest to three Commercial Union Insurance Company Commercial General Liability Policies in effect from March 26, 1990 to March 26, 1997 agreed to provide a defense to BCSA under a reservation of rights. However, Defendant Travelers, the successor in interest to two Aetna Commercial General Liability policies effective from March 26, 1988 to March 26, 1990, denied coverage on the ground that while the allegations of "false and malicious attacking of the reputation and clinical skills of the plaintiff ... may generate coverage under the definition 'personal injury,'... the time frame for these allega-tions ... is during 1992 and 1993." Thus, Travelers took the position that "[t]here is nothing in the Complaint to indicate that any potential allegation which may be covered under personal injury occurred prior to March 26, 1990, which is when Aetna ceased coverage on this account." (Pl's Amended Complaint, Exhibit "E").

From the inception of the Angelico lawsuit then, Plaintiff has funded BCSA's entire defense on its own which, to date, has cost some $77,000. As a consequence of Travelers' steadfast denial of coverage, Plaintiff instituted this action in December, 1999 seeking reimbursement from it for one-half of the defense costs incurred to date and a declaration that it is obligated to assume a duty to defend BCSA as a co-insurer at the primary level in the suit brought by Dr. Angelico. Count III of the plaintiff's complaint also seeks a declaration that in the event that Travelers is found to not have had a duty to defend BCSA in the *Angelico* suit under the Pennsylvania Superior Court's decision in *Roman Mosaic and Tile Co., et. al. v. Aetna Casualty and Surety Co., et. al.*, 704 A.2d 665 (Pa.Super.1997), that Plaintiff too is relieved of its obligation to defend their mutual insured. Plaintiff now moves for summary judgment with respect to Counts I and II of its Complaint.

### Standards Applicable to Summary Judgment Motions

The standards to be applied by the district courts in ruling on motions for summary judgment are set forth in Fed. R.Civ.P. 56. Under subsection (c) of that rule,

> ....The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of

liability alone although there is a genuine issue as to the amount of damages.

Pursuant to this rule, a court is compelled to look beyond the bare allegations of the pleadings to determine if they have sufficient factual support to warrant their consideration at trial. *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287 (D.C.Cir.1988), *cert. denied*, 488 U.S. 825, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988); *Aries Realty, Inc. v. AGS Columbia Associates*, 751 F.Supp. 444 (S.D.N.Y.1990). Generally, the party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In considering a summary judgment motion, the court must view the facts in the light most favorable to the non-moving party and all reasonable inferences from the facts must be drawn in favor of that party as well. *Troy Chemical Corp. v. Teamsters Union Local No. 408*, 37 F.3d 123, 126 (3rd Cir.1994); *U.S. v. Kensington Hospital*, 760 F.Supp. 1120 (E.D.Pa.

1991); *Schillachi v. Flying Dutchman Motorcycle Club*, 751 F.Supp. 1169 (E.D.Pa. 1990). *See Also: Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3rd Cir. 1989); *Tziatzios v. U.S.*, 164 F.R.D. 410, 411, 412 (E.D.Pa.1996). "Material" facts are those facts that might affect the outcome of the suit under the substantive law governing the claims made. An issue of fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party" in light of the burdens of proof required by substantive law. *The Philadelphia Musical Society, Local 77 v. American Federation of Musicians of the United States and Canada*, 812 F.Supp. 509, 514 (E.D.Pa. 1992) citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 252, 106 S.Ct. 2505, 2510, 2512, 91 L.Ed.2d 202 (1986).

### Discussion

By this motion, Plaintiff argues that summary judgment must be granted in its favor because there are no issues of material fact as to whether Travelers owes a defense to BCSA. In so arguing, Plaintiff relies upon the language [1] in the Aetna/Travelers policy which provides, in relevant part:

**B. PERSONAL AND ADVERTISING INJURY LIABILITY**

2. violation of right of privacy;
3. unfair competition; or
4. infringement of copyright, title or slogan, but not infringement of any other trademark, service mark or trade name.

**Personal Injury** means injury arising out of one or more of the following offenses committed during the policy period in the conduct of your business:

1. false arrest, detention or imprisonment, or malicious prosecution;
2. the publication or utterance of a libel or slander, or of other defaming or disparaging material, or a publication or utterance in violation of an individual's right of privacy. This does not include publications or utterances in the course of, or related to, advertising, broadcasting or telecasting activities conducted by you or on your behalf; or
3. wrongful entry or eviction, or other invasion of the right of private occupancy.

---

1. The pertinent language in the plaintiff's policies is nearly identical to that contained in the defendant's:

**WHAT IS COVERED**

The following coverages apply when caused by an *occurrence* insured by this policy and not otherwise excluded:

.    .    .    .    .

**2. PERSONAL INJURY AND ADVERTISING INJURY LIABILITY**. We cover all sums which the *insured* is legally required to pay as damages because of *personal injury* or *advertising injury* committed in the course of your business.

**POLICY DEFINITIONS**

**Advertising Injury** means injury arising out of an offense committed during the policy period occurring in the course of your advertising activities, if such injury arises out of:

1. libel, slander or defamation;

### 1. Insuring Agreement

a. We will pay those sums that the "insured" becomes legally obligated to pay as damages because of "personal injury" or "advertising injury" to which this insurance applies. No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SECTION III Supplementary Payments–Coverages A and B. We will have the right and duty to defend any "suit" seeking those damages . . .

b. This insurance applies to "personal injury" only if caused by an offense:

(1) Committed in the "coverage territory" during the policy period; and

(2) Arising out of the conduct of your business, excluding advertising, publishing, broadcasting or telecasting done by or for you.

c. This insurance applies to "advertising injury" only if caused by an offense committed:

(1) In the "coverage territory" during the policy period; and

(2) In the course of advertising your goods, products or services.

Under Section V, Commercial General Liability Definitions,

"ADVERTISING INJURY" means injury arising out of one or more of the following offenses:

a. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

b. Oral or written publication of material that violates a person's right of privacy;

c. Misappropriation of advertising ideas or style of doing business; or

d. Infringement of copyright, title, or slogan.

"PERSONAL INJURY" means injury, other than "bodily injury," arising out of one or more of the following offenses:

b. False arrest, detention or imprisonment;

c. Malicious prosecution;

d. Wrongful entry into, or eviction of a person from, a room, dwelling or premises that the person occupies;

e. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or

f. Oral or written publication of material that violates a person's right of privacy.

It is a well-accepted principle that an insurer's duty to defend is conceptually distinct from and legally independent of its duty to indemnify, that is, its obligation to pay a judgment. *Erie Insurance Exchange v. Transamerica Insurance Company*, 516 Pa. 574, 583, 533 A.2d 1363, 1368 (1987); *USX Corporation v. Adriatic Insurance Company*, 99 F.Supp.2d 593, 611 (W.D.Pa.2000). If the complaint filed against the insured avers facts which would support a recovery that is covered by the policy, it is the duty of the insurer to defend until such time as the claim is confined to a recovery that the policy does not cover. *Erie Insurance Exchange, supra*, citing *Cadwallader v. New Amsterdam Casualty Co.*, 396 Pa. 582, 152 A.2d 484 (1959); *Frog Switch & Manufacturing Co. v. Travelers Insurance Co.*, 193 F.3d 742, 746 (3rd Cir.1999); *Northern Insurance Company of New York v. Aardvark Associates, Inc.*, 942 F.2d 189, 195 (3rd Cir.1991). Stated otherwise, since the insurer agrees to relieve the insured of the burden of defending even those suits which have no basis in fact, the obligation to defend arises whenever the complaint filed by the injured party may potentially come within the coverage of the policy. *Redevelopment Authority of Cambria County v. Internation-*

*al Insurance Co.,* 454 Pa.Super. 374, 389, 685 A.2d 581, 588 (1996).

To determine whether a claim may potentially come within the coverage of a policy, the court must ascertain the scope of the insurance coverage, and then analyze the allegations in the complaint. *Diamond State Insurance Co. v. Ranger Insurance Co.,* 47 F.Supp.2d 579, 584 (1999). It should be noted that the determination of coverage is not based solely on the particular cause of action pleaded, but instead it is necessary to look at the factual allegations contained in the complaint. *USX Corp. v. Adriatic,* 99 F.Supp.2d at 611, citing, *inter alia, Mutual Benefit Insurance Co. v. Haver,* 555 Pa. 534, 725 A.2d 743, 745 (1999). The averments of the underlying complaint must be liberally construed with all doubts as to whether the claims may fall within the policy coverage to be resolved in favor of the insured. *Id.; Roman Mosaic & Tile Co. v. Aetna Casualty & Surety Co.,* 704 A.2d 665, 669 (Pa.Super.1997).

According to CGU, the complaint in the underlying *Angelico* matter alleges facts (i.e. defamation and libel) which could potentially trigger Travelers' defense obligations. Travelers, however, maintains that it owes no duty to defend or indemnify BCSA because, despite the averments of slander, the only two counts directed to its insured seek damages for group boycott and for monopoly and conspiracy to monopolize in violation of the Sherman Act, 15 U.S.C. §§ 1 and 2. In taking this position, Defendant relies upon *Roman Mosaic and Tile Co. v. Aetna Casualty and Surety Co.,* 704 A.2d 665 (Pa.Super.1997).

In the *Roman Mosaic & Tile* case, the plaintiff was sued by a former employee for sexual discrimination and harassment. Specifically, the plaintiff in that underlying action contended that Roman Mosaic discriminated and harassed her by permitting its employees to urinate in her work shoes, to make derogatory remarks based on her gender by referring to her as a "slut," "fat pig," and "whore," to throw a wheelbarrow at her, to place her in a wire cage and drag it around the job site and to place her in a metal drum and roll it around the job site.

Following the settlement of that underlying lawsuit, Plaintiff company and one of its insurers instituted their own action against Aetna and PMA Insurance Companies to compel them to contribute to the settlement, arguing that the claims in the underlying action fell under the "personal injury" provisions contained in both policies. In affirming the trial court's entry of summary judgment in favor of the two defendant insurers, the Pennsylvania Superior Court observed that if the nature of the allegations and claims raised in the underlying complaint arose out of the torts enumerated in the policy, those claims would potentially fall under the coverage of the policy and the defendant companies would be under the duty to defend. However, reasoned the Court, nowhere in the complaint did the plaintiff employ the words false imprisonment, defamation or invasion of privacy. Nowhere in the complaint did the plaintiff specifically assert a claim for anything other than sexual harassment and gender discrimination. Thus, the Superior Court concluded,

> [t]he underlying plaintiff's injuries were not causally connected with individual acts of false imprisonment, defamation or invasion of privacy. Nor were her injuries pled as being the result of those enumerated causes of action. Rather the nature of the factual allegations and claims raised in the complaint clearly plead that plaintiff's injuries were the result of collective instances of sexual harassment and gender discrimination over a period of years. Thus, those injuries are part and parcel of her sexual harassment lawsuit. As previously stated, the actual details of Ms. Jesiolowska's injuries are not dispositive of whether appellees had a duty to defend. Rather, it is the nature of the allegations and claims that fixes the determination. Here, because the nature of the allegations and claims raised in the underlying

suit consist of injuries resulting from acts of harassment and discrimination, acts not covered by the policies, appellees were under no duty to defend and the court's order granting summary judgment to appellees was proper.

704 A.2d at 669.

■ In this case, the complaint in the *Angelico* action alleges, in pertinent part:

18. On September 19, 1989, Dr. Angelico resigned from defendant Panebianco–Yip and established a solo practice maintaining Active Privileges at both LVH and St. Luke's....

21. Prior to Dr. Angelico's admission to the St. Luke's medical staff, defendant BCSA had an exclusive contract with St. Luke's to perform all heart surgery. Dr. Angelico was one of the first physicians to join the staff after St. Luke's opened cardiac surgery to other Lehigh Valley surgeons.

22. Dr. Angelico began to build his practice at St. Luke's as his reputation for excellence became known in the community. In the first couple of years while working for the Panebianco–Yip group, Dr. Angelico performed approximately 150 open heart surgeries per year. As a sole practitioner, he increased the number of open heart procedures averaging 200 to 250 annually since 1990, in addition to an equal number of non-cardiac surgical procedures....

30. As is clearly demonstrated by the above data, defendants LVH, St. Luke's, Panebianco–Yip and BCSA collectively had sufficient market share to control the market, including pricing and market allocation.

31. Dr. Angelico, as the lone substantial independent sole practitioner, threatened defendants' control of the market, and defendants, therefore, embarked on a campaign and conspiracy to eliminate Dr. Angelico as a competitor and an independent force in the market through various predatory acts.

32. Although successful in building his practice during this period, it was not without difficulty. When Dr. Angelico first began working at St. Luke's, the two surgeons in BCSA, Drs. Terrill Theman and William Hoffman, attempted to monopolize operating room time and intensive care bed allocation, thereby limiting Dr. Angelico's ability to compete.

33. When Dr. Angelico's practice increased despite the efforts of defendant BCSA to control the number of surgeries, defendant BCSA, with the clandestine help of defendant St. Luke's, began a campaign of slander and innuendo directed at destroying Dr. Angelico's reputation and competing practice.

34. Defendant BCSA, through Dr. Theman and his agents, circulated letters containing derogatory remarks about Dr. Angelico among St. Luke's nurses loyal to BCSA seeking their signature in an effort to limit competition. Dr. Theman also began a personal letter writing campaign against Dr. Angelico falsely alleging that Dr. Angelico was disruptive and neglectful of patient care. Dr. Theman even recruited the wife of his associate Dr. Hoffman, Margaret Kraybill, M.D., to write false and malicious statements about Dr. Angelico, even sending copies of the false statements to Dr. Angelico's referring cardiologists. Defendant BCSA and its representatives knew its remarks about Dr. Angelico were false.

Thus, unlike *Roman Mosaic & Tile,* Dr. Angelico has specifically pled that the injuries which he allegedly suffered were caused in part by the defamatory and slanderous remarks made by Drs. Theman, Kraybill and Hoffman and by the campaign of slander which BCSA waged against him in an effort to destroy his professional reputation and competing practice and thereby monopolize the coronary graft surgical market. As is clear from the foregoing, Pennsylvania law dictates that we look beyond the technical confines of the legal theories under which

relief is being sought to the factual allegations pled. In so doing, we find that while the time frame in which the purportedly slanderous and defamatory remarks were made is far from clear, the complaint as written raises the possibility that they or some of them were made while the Aetna policy was still in effect. We therefore find that Dr. Angelico's averments against BCSA were more than sufficient to have triggered Travelers' obligation to defend it. Accordingly, we shall grant the plaintiff's motion for summary judgment here and direct that the defendant reimburse the plaintiff for one-half of the costs which it has incurred in providing the defense to its mutual insured to date.[2]

2. In so holding, we look to the language of both policies. Under the Aetna Policy,

[i]f other valid and collectible insurance is available to the "insured" for a loss we cover under Coverages A or B of this Coverage Form, ... this insurance is primary except when b below (excess insurance) applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in c below. Under c ("Method of Sharing"), "[i]f all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach, each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first."

The CGU policy likewise includes the same language under its subsection c, also entitled "Method of Sharing." Consequently, we find that decreeing that the parties share equally in the costs of BCSA's defense is equitable. *See Also: Nationwide Insurance Company v. Horace Mann Insurance Co.*, 759 A.2d 9 (Pa.Super.2000); *First Pennsylvania Bank, N.A. v. National Union Fire Insurance Company of Pittsburgh*, 397 Pa.Super. 612, 580 A.2d 799 (1990); *F.B. Washburn Candy Corp. v. Fireman's Fund*, 373 Pa.Super. 479, 541 A.2d 771 (1988); *Couch on Insurance, § 217:9* (1997).