## Villella v. Katzen

C.P. of Clearfield County, no. 1993-760-C.D.

*Anthony Guido,* for plaintiff.
*Thomas C. Marshall,* for defendants.

AMMERMAN, *J.,* December 20, 2001—In 1986, plaintiff Francis A. Villella requested that the Clearfield County Industrial Development Authority finance a certain commercial development warehouse project (C warehouse project) for plaintiff. In order to provide financing to plaintiff, First Mortgage Revenue Bonds Series of 1986 were issued by the authority to finance the acquisition and construction of C warehouse project, located in Sandy Township, Clearfield County. Bonds in the total amount of $1,100,000 were issued to Deposit Bank, Marcus Katzen, Marshall Katzen, Bari Boyer, Harry Kellar as

trustee for Brit Katzen and Harry Kellar as trustee for Brook Katzen. The bonds issued to Deposit Bank contained different terms from the bonds issued to the individual bondholders, and the underlying issue in this litigation concerns the validity of the bonds which are owned by the individual bondholders.

On May 21, 1993, plaintiff instituted this action by filing a complaint in the Court of Common Pleas of Clearfield County. Thereafter, defendants removed the case to the United States District Court for the Western District of Pennsylvania. The federal court dismissed Counts I and III of plaintiff's complaint with prejudice for failure to state a claim upon which relief could be granted. Thereafter, the federal court determined sua sponte that it lacked jurisdiction and remanded the case to this court on February 17, 1995. Defendants filed preliminary objections to plaintiff's complaint in this court, and Counts I and III were dismissed by this court. In the interim, plaintiff filed a complaint in equity seeking to reform the bonds issued to the individual bondholders. Defendant again filed preliminary objections, whereupon this court dismissed most of the counts in plaintiff's equity action.

After dismissal of most of plaintiff's claims in this matter, the counts of plaintiff's complaint which remained for consideration by this court are Count II of plaintiff's action at law and Count IV of plaintiff's equity action. Count II of plaintiff's action at law alleges a conflict of interest based upon the alleged attorney/client relationship between defendant Marcus Katzen and plaintiff. Count IV of plaintiff's complaint in equity is an effort

by plaintiff to rewrite the terms of the transaction by reducing the reserve required pursuant to the bond documents from the $350,000 contained in the loan documents to $130,000 and $260,000 at the end of the third and sixth years respectively.

A civil non-jury trial was held in this matter on November 8 and 9, 2000 and July 17 and 18, 2001.[1] Following a period of delay caused by the parties' desire to have the trial transcribed, briefs have been received and the matter is set for decision.

The events giving rise to plaintiff's claims began in 1986, when plaintiff requested that the authority finance the C warehouse project for him. The C warehouse project involved the purchase of 5.01 acres of land originally owned by General Warehousing, a corporation owned by various members of the Katzen family, (Tr. I, 25), and the development of a warehouse thereon. (Joint exhibit 1.) In order to provide financing to plaintiff, the bonds were issued by the authority. Pursuant to the industrial development loan financing arrangement, the land was conveyed to the authority, who in turn executed and delivered a first mortgage to Deposit Bank in the amount of $1,100,000 secured by a mortgage loan agreement. The mortgage from the authority was executed and delivered to secure $1,100,000 of tax-exempt commercial development bonds issued by the authority to the following:

(a) Deposit Bank—$800,000;

---

1. The trial could not be completed in November 2000. The delay until July 2001 was caused by various continuances requested by counsel.

(b) Marcus Katzen—$160,000;

(c) Marshall Katzen—$50,000;

(d) Bari Boyer—$50,000;

(e) Harry Kellar as trustee for Brit Katzen—$20,000;

(f) Harry Kellar as trustee for Brook Katzen—$20,000;

Total: $1,100,000. (Joint exhibit 1.)

Closing on the C warehouse project occurred in late December 1986, as it was necessary to complete the transaction prior to a change in the tax law effective January 1, 1987, after which time the project would no longer be tax-exempt. (Tr. I, 59.)

Defendant Marcus Katzen had begun in January or February of 1986 to put together the deal that became the C warehouse project, prior to plaintiff's involvement. He began by searching for at least two investors, originally intending to structure a joint venture similar to prior deals in which he had been involved. Plaintiff, upon hearing about the C warehouse project from Marcus Katzen, was interested in participating and wanted to be the sole investor. He testified that he was interested in a $200,000 investment rather than a $100,000 investment. (Tr. III, 107.)

Marcus Katzen did much of the initial work to put the deal together, including designing the initial structure and elements of the transaction. He patterned the transaction after a prior project in which he was involved, B warehouse, and the C warehouse project contains many of the same features. The project originally was to have General Warehousing, a company partly owned by

14

Marcus Katzen, in the place of the plaintiff, but plaintiff was offered the opportunity to be investor-developer due to a change in the tax laws. (Tr. IV, 27-29.) In any event, Marcus Katzen's role in the project was to coordinate among the various parties to the transaction, for which he was paid a $25,000 supervision fee by plaintiff. The fee was paid by plaintiff as investor-developer, the only party in the transaction with access to the proceeds directly to Deposit Bank, which issued bonds to Marcus Katzen, who paid an additional $15,000 in cash to receive $40,000 worth of bonds. According to Victor Lynch, Esquire, bond counsel for the transaction who was certified as an expert during trial and provided credible testimony, supervision fees of this type are "very usual" for bond transactions. He further testified that Marcus Katzen's $25,000 supervision fee was reasonable and that he did not question it. (Tr. I, 118-19.)

Defendant Marcus Katzen received a law degree and practiced law from 1965 until 1975. However, in 1975 he sold his practice and became a full-time real estate investor, as well as for a time being a Jefferson County commissioner. After he sold his practice, he retained a few existing clients until approximately 1980, when he moved to Florida. He did not meet plaintiff until 1984, some years after he stopped practicing law. At the time of closing in 1986, clearly Mr. Katzen was not a practicing attorney and all parties agreed at trial that his company is not a law office. (Tr. III, 52.) He never solicited any legal work from plaintiff and never entered into any legal fee agreement with plaintiff.

Legal work was handled by attorneys Anthony Guido (real estate counsel) and Victor Lynch (bond counsel).

In fact, while practicing law Marcus Katzen never served as bond counsel for any transaction and was not qualified to do so. Victor Lynch, Esquire, as bond counsel, had participated in several projects with Marcus Katzen prior to the C warehouse project. (Tr. I, 19-30.) Anthony Guido, Esquire, as real estate counsel, rendered an opinion of counsel concerning title to the land which was a necessary pre-condition for closing. (Tr. I, 113.) Attorney Guido is listed as the seller's—*i.e.*, defendants—real estate counsel in the closing documents. (Joint exhibit 1; Tr. I, 112-13.) The closing documents do not list any party as counsel to the investor-developer.

Plaintiff owned his own business from 1979 until 1985 and had some involvement in real estate during this time in terms of leasing property. Plaintiff was a sophisticated businessman in 1986, in that he had been president of a multimillion dollar business and served on its board of directors. (Tr. III, 91-93.) After plaintiff sold his business, he devoted more attention to real estate, and was involved in several deals with defendant Marcus Katzen prior to the C warehouse project. Prior to becoming involved in the project, plaintiff reviewed a marked-up joint venture agreement as an example of what the project might look like. (Plaintiff's exhibit A.) That document contained features similar to those about which plaintiff now complains, such as shared appreciation, shared rental, and no prepayment. Plaintiff had plenty of time to review this document and negotiate any of its terms.

Victor Lynch's undisputed expert testimony established that revenue bonds, such as those issued here, com-

monly contain provisions such as shared rental and shared appreciation because of the great risk associated with such bonds. In essence, these bonds are secured by commercial real estate, the revenue associated with which is derived from short-term commercial leases. The value of this collateral is greatly reduced if a lease is lost. Shared rental is a provision which provides the bondholders with additional revenue if rental income from the property exceeds a certain amount. Shared appreciation involves additional payment to the bondholders if the project is sold for a price in excess of a certain specified amount. (Joint exhibit 1.) The bonds also contained an appraisal feature which permitted the bondholders to base their shared appreciation upon the average appraisals of two expert appraisers. The purpose of this provision was to prevent the investor-developer from selling to a straw party at below market value. These provisions are not unusual. In fact, the C warehouse transaction was set up in a fashion similar to prior transactions in which Marcus Katzen was involved. Items such as shared appreciation and shared rental provisions were included.

Section 5.1 of the mortgage loan agreement specifically states that the investor-developer may sell his interest in the project at any time without restriction. Nevertheless, plaintiff cannot sell his interest in the C warehouse project without the approval of the bondholders, unless he sells it subject to the bonds. This does not affect the alienability of the real estate, but it does restrict the ability of the debtor to pay off his bonds early. It is common for bonds to contain non-redemption provisions. (Tr. I, 108.)

Section 4.1 of the mortgage loan agreement requires that a bond reserve fund be maintained in the amount of $350,000. On November 24, 1986, Marcus Katzen sent a letter to Deposit Bank requesting a bond reserve amount of $350,000, (Tr. II, 130), the amount which was set forth on the spreadsheet prior to plaintiff's involvement in the transaction and which Mr. Katzen later reviewed with plaintiff. Plaintiff claims that the bonds should be reformed to reduce the reserve required pursuant to the bond documents from the $350,000 contained to the loan documents to conform to the loan commitment letter— *i.e.,* $130,000 and $260,000 at the end of the third and sixth years respectively. Although these figures are contained in the commitment letter issued by Deposit Bank to plaintiff, James Baker, the loan officer for Deposit Bank, never discussed with Marcus Katzen the lower figures that were part of the bank documents but never of the bonds. (Tr. II, 130.) The purpose of the bond reserve fund is to protect the bondholders. (Tr. II, 18-19.) In this transaction, the individual bondholders bargained for a higher reserve than Deposit Bank requested because the individual bondholders had more risk in the transaction. This is true because the plaintiff's personal guarantee only lasts through the first six years of the deal. (Tr. II, 20.) The individual bondholders, whose bonds contain a 33-year term, as opposed to the 15-year term contained in Deposit Bank's bonds, have a longer period of exposure, and thus more risk. (Tr. IV, 57-58.) In addition, an older building requires a larger reserve because maintenance and upkeep become more expensive and older buildings tend to have more vacancies. Also, initial leases run out and may not be renewed.

Plaintiff testified that he did not consent in writing to the provisions of the bonds to which he now objects and that he would not have entered into the transaction had he known that the bonds contained features such as shared appreciation and shared rentals. (Tr. II, 73-74.) Nevertheless, plaintiff executed the investor-developer's acknowledgment at closing, (joint exhibit 1), and he stipulated that his signature was authentic each place it is contained on joint exhibit 1. (Tr. III, 102.) In this document, he acknowledged that he had read, understood and accepted the documents in their final form. (Tr. II, 12.) Moreover, section 1.2 of the mortgage loan agreement contains various certifications on the part of the plaintiff, as investor-developer, that he is an experienced real estate developer and that he agrees to all of the various terms and conditions of the loan documents. (Tr. II, 17-18; joint exhibit 1.)

## ISSUES

(A) Whether defendant Marcus Katzen acted as plaintiff's attorney?

(B) Whether a confidential relationship existed between Marcus Katzen and the plaintiff?

(C) Whether plaintiff should be permitted to reform the bonds in order to lower the reserve requirement?

All legal issues remaining in this case revolve around whether defendant Marcus Katzen acted as plaintiff's attorney. If he did not do so, the bonds and related closing documents must be enforced as written.

Since a civil non-jury trial was held in this matter, this court is charged with judging the credibility of the witnesses and determining what weight to accord their testimony. *Weir by Gasper v. Estate of Ciao,* 521 Pa. 491, 556 A.2d 819 (1989). The court's determinations must be supported by competent evidence of record. *Bethlehem Steel Corp. v. Litton Industries Inc.,* 507 Pa. 88, 488 A.2d 581 (1985). Based upon the testimony at trial, decision can only be rendered in favor of the defendants. Plaintiff has the burden of establishing each and every element of his claims, and he has failed to carry his burden here.

### A. *Defendant Marcus Katzen Did Not Act As Plaintiff's Attorney*

Defendant Marcus Katzen, although an attorney in that he has a law degree, is not a practicing attorney and has not practiced law since he sold his practice in 1975, with the exception of a few existing clients which he continued to service until approximately 1980. In any case, by 1986 he had not practiced law at all for at least six years. Defendant Marcus Katzen is currently engaged on a full-time basis in the business of supervising the construction, leasing and development of commercial projects such as the C warehouse project.

In connection with the C warehouse project, plaintiff paid to defendant Marcus Katzen a construction supervision fee of $25,000. This fee was a supervision fee for the development of C warehouse and not a legal fee. The court finds that defendant Marcus Katzen did not engage in any legal work and did not render any legal advice in connection with the C warehouse project. His

role was not that of an attorney, but instead that of a project coordinator. Since no attorney/client relationship exists, plaintiff has neither grounds nor standing to sustain an action against defendant Marcus Katzen for professional negligence. See *McHugh v. Litvin, Blumberg, Matusow & Young,* 525 Pa. 1, 574 A.2d 1040 (1990) (noting that establishment of an employment relationship or other basis for duty is an essential element of a legal malpractice claim); *Guy v. Liederbach,* 501 Pa. 47, 459 A.2d 744 (1983) (retaining the requirement that the plaintiff in a professional malpractice action based on negligence must show an attorney/client relationship to maintain suit); *Mursau Corp. v. Florida Penn Oil & Gas Inc.,* 638 F. Supp. 259, 262 (W.D. Pa. 1986) (holding that "to recover for a breach of fiduciary duty by an attorney, the plaintiff has a threshold burden of showing existence of an attorney-client relationship"), *aff'd,* 813 F.2d 396 and 398 (3d Cir. 1987).

To create the relationship of attorney and client, there must be some agreement for one party to perform services of the type usually rendered by lawyers, such as to give advice, to render services in court, and to prepare legal papers. Standard Pennsylvania Practice §4:26. In the present case, no such relationship has ever existed between plaintiff and defendant Marcus Katzen.

It is undisputed that no express contract exists between Marcus Katzen and plaintiff whereby Marcus Katzen was to act as plaintiff's attorney. The existence of any such contract has never been alleged by plaintiff, and no evidence was adduced at trial to the effect that any such contract exists. Thus, the issue becomes whether an im-

plied contract exists. In *Atkinson v. Haug,* 424 Pa. Super. 406, 411-12, 622 A.2d 983, 986 (1993), the Superior Court, with respect to the existence of an attorney/client relationship stated that:

"Absent an express contract an implied attorney/client relationship will be found if (1) the purported client sought advice or assistance from the attorney; (2) the advice sought was within the attorney's professional competence; (3) the attorney expressly or impliedly agreed to render such assistance; and (4) it is reasonable for the putative client to believe the attorney was representing him."

In that case, Haug and Atkinson were partners in an apartment complex venture. Atkinson brought suit against Haug, an attorney, alleging negligence and malpractice. Haug invested in real estate in addition to pursuing his legal career, and Atkinson, one of his partners, was a college graduate and owner and president of a transportation business employing 90 persons. *Id.* at 412, 622 A.2d at 986. In finding no attorney/client relationship, the court declared that the fact that Haug was an attorney by trade did not mean that each of his utterances was "legal advice," capable of being upheld as such in the courts of this Commonwealth. *Id.* at 414, 622 A.2d at 987. The court concluded that when investing, Attorney Haug simply donned his investor hat and recruited friends and acquaintances to join what all believed would be a profitable venture and that Atkinson's subjective belief that an attorney/client relationship existed was insufficient grounds to establish that relationship. *Id.*

In the case at bar, there is no express or implied contract for the performance of legal services between defendant Marcus Katzen and plaintiff. At best, plaintiff had a subjective belief that Marcus Katzen was his attorney. Such a belief, even if sincerely held, is not reasonable. Plaintiff knew prior to closing that the land he was purchasing was owned or controlled by Marcus Katzen and members of his family. Plaintiff also knew prior to closing that Marcus Katzen would be a bond-holder. Thus, plaintiff knew prior to closing that Marcus Katzen's interests in this transaction were adverse to plaintiff's interests. Moreover, Marcus Katzen did not communicate the terms of bonds to plaintiff in any way, (Tr. III, 27-33), and did not review documents with plaintiff prior to closing. (Tr. II, 115.) Plaintiff has not demonstrated in any way that defendant Marcus Katzen ever held himself out to any party as plaintiff's attorney.

### B. *No Confidential Relationship Exists Between Marcus Katzen and the Plaintiff*

In connection with alleging that defendant Marcus Katzen was plaintiff's attorney, plaintiff has also alleged that a confidential relationship exists between him and Marcus Katzen. Where a confidential relationship exists, the law presumes the transaction voidable unless the party seeking to enforce the agreement demonstrates that it was fair under all of the circumstances and beyond the reach of suspicion. *Frowen v. Blank,* 493 Pa. 137, 425 A.2d 412 (1981).

The general test for determining the existence of a confidential relationship is whether it is clear that the

parties did not deal on equal terms. *Id.* at 145, 425 A.2d at 416. In defining a confidential relationship, the Pennsylvania Supreme Court in *Leedom v. Palmer,* 274 Pa. 22, 25, 117 A. 410, 411 (1922), said:

"Confidential relation is not confined to any specific association of the parties; it is one wherein a party is bound to act for the benefit of another, and can take no advantage to himself. It appears when the circumstances make it certain the parties do not deal on equal terms, but, on the one side there is an overmastering influence, or, on the other, weakness, dependence or trust, justifiably reposed; in both an unfair advantage is possible."

No such circumstances exist here. The parties did deal on equal terms. Plaintiff is an adult individual under no legal disability, and no cause exists to demonstrate that Marcus Katzen had an overmastering influence on him. There is no evidence to support a finding that plaintiff was a victim of weakness, dependence or trust, justifiably reposed.

## C. *Plaintiff Should Not Be Permitted To Reform the Bonds in Order To Lower the Reserve Requirement*

In his equity claim, plaintiff is seeking to reform the terms of the bonds in order to reduce the reserve requirement to that set forth in Deposit Bank's commitment letter. It has long been the law that courts of equity have the power to reform a written instrument where there has been a showing of fraud, accident or mistake. *Kutsenkow v. Kutsenkow,* 414 Pa. 610, 202 A.2d 68 (1964). Absent some legally recognized infringement of the law of contract, however, the law will not reform a

written contract for the parties in order to insert or delete terms that they did not make between themselves and certainly never rescue a party who did not reasonably foresee the consequences of his bargain. *New Charter Coal v. McKee,* 411 Pa. 307, 192 A.2d 221 (1963).

It is axiomatic that, when two parties bargain in good faith and come to an agreement acceptable at the time, one party cannot later come into court and ask for a change in the terms of the agreement because it has not worked to his advantage. *Chapleski v. Department of Highways,* 5 Pa. Commw. 482, 291 A.2d 360 (1972). Since the terms of the bonds and other closing documents were freely arrived at by the contracting parties, there is no law which does, or could, reform the terms and conditions of the bonds. The financing arrangement here at issue was an arm's length commercial transaction involving commercial parties and at least two attorneys. Plaintiff had the opportunity to consider the terms and conditions of which he now complains, and he freely agreed to them and obligated himself to them.

The plaintiff expressly acknowledged the terms and conditions of the bonds by executing the investor-developer's general certificate. In paragraph 5 of the said certificate, plaintiff certified that:

*"The investor-developer also approves of the form, execution and delivery of the first mortgage revenue bonds, the debt resolution, and the bond purchase proposals."* (Joint exhibit 1.) (emphasis added)

Plaintiff expressly affirmed his consent to the terms and conditions of the bonds and other closing documents

by executing the investor-developer's general certificate. He cannot now attempt to revoke his consent to the terms of the bonds simply because he has had a change of heart.

This court cannot possibly accede to plaintiff's request that this court undo what plaintiff already, upon due reflection, has committed himself to do. The defendants seek nothing more than to assure that they continue to receive the benefit for which they bargained. The plaintiff, on the other hand, is requesting that this court renegotiate the bargain and, as a matter of law, such a request is improper.

Plaintiff asserted that he did not read the bonds and other closing documents prior to executing them; however, Attorney Lynch testified that plaintiff did not request any revisions to any term or condition of the documents. Under Pennsylvania law failure to read documents prior to executing them does not support a cause of action for reformation. "The law of Pennsylvania is clear. One who is about to sign a contract has a duty to read that contract first," *Schillachi v. Flying Dutchman Motorcycle Club,* 751 F. Supp. 1169, 1174 (E.D. Pa. 1990), *aff'd,* 944 F. 2d 898 (3d Cir. 1991), because *"[c]ontracting parties are normally bound by their agreements, without regard to whether the terms thereof were read and fully understood and irrespective of whether the agreements embodied reasonable or good bargains." Simeone v. Simeone,* 525 Pa. 392, 400, 581 A.2d 162, 165 (1990). (citations omitted) (emphasis added)

"Once a person enters into a written agreement he builds around himself a stone wall, from which he cannot escape by merely asserting he had not understood

what he was signing." *Bollinger v. Central Pennsylvania Quarry Stripping & Construction Co.,* 425 Pa. 430, 432, 229 A.2d 741, 742 (1967).

Plaintiff alleges that the terms of the closing document should be reformed because they are inconsistent with the terms of the commitment letter. The terms of the commitment letter became irrelevant and merged with the terms of the closing document when plaintiff executed the closing documents. The letter certainly does not survive the subsequent execution of documents which expressed the real agreement of the parties. Moreover, defendants are not even parties to the bank's commitment letter. The commitment letter was issued by Deposit Bank and executed by plaintiff. It was not executed by any defendant. All testimony and evidence, including Marcus Katzen's letter to Deposit Bank on November 24, 1986 demonstrates that defendants intended for the reserve account to be maintained at $350,000. In view of the fact that reformation is a remedy which is available when a written instrument fails to express the real agreement or intention of the parties, *Potteiger v. Fidelity-Philadelphia Trust Co.,* 424 Pa. 418, 227 A.2d 864 (1967), it would be particularly inappropriate for defendants to be bound by its terms when defendants did not intend for the reserve account to be maintained at the level set forth in the commitment letter.

Finally, it would be manifestly unfair to the defendants other than Marcus Katzen to disturb this transaction. There are no allegations of wrongdoing against any of them, but any modifications made to the bonds would operate to their detriment. Moreover, it has never been

alleged by any party that Marcus Katzen represented the other bondholders. Even if this court were to find that Marcus Katzen was representing plaintiff in the transaction, it can hardly order reformation of the bonds when such a remedy would hurt third parties not represented by Mr. Katzen. The consequences of reforming the bonds could be extreme. Attorney Victor Lynch, who as noted was qualified during trial as an expert in matters related to bonds, testified that in his opinion any action by the court to alter the terms of the bonds would trigger a re-issuance of the bonds under IRS regulations. This means that the bonds would be treated as if issued this year rather than in 1986, which would deprive them of their tax-exempt status. (Tr. I, 106.)

## ORDER

Now, December 20, 2001, it is the order of this court as follows:

(1) The plaintiff's amended complaint is hereby dismissed. Court costs to be borne by the plaintiff.

(2) For purposes of any appeal, this order shall not be considered a final order. The parties are still litigating the defendant's counterclaim on defendant's legal fees and amounts paid out of the reserve fund by plaintiff to his attorney. The parties have agreed that the order to be entered by the court on the counterclaim issues will be considered a final order for appeal issues.